THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES BOOKER, Defendant-Appellant.

First District (5th Division)   No. 1—89—0519

Opinion filed January 25, 1991.

Michael J. Pelletier and Leslie Wallin, both of State Appellate Defender's Office, of Chicago, for appellant.

John M. O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Jane E. Loeb, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

Defendant Charles Booker (Booker) was tried before a jury for the August 7, 1987, murder of his girl friend, Lucy Williams. He was found guilty and subsequently sentenced to 30 years' imprisonment in the Illinois Department of Corrections. He now brings this appeal, raising these issues: (1) whether the trial court erred when it denied his motion to quash his arrest and suppress the inculpatory statements he made to police, (2) whether the trial court improperly admitted evidence at trial which it had previously ordered suppressed, and (3) whether he was denied a fair trial because of the improper admission of an inflammatory photograph depicting the victim. For reasons we shall discuss, we reverse Booker's conviction, but remand for further proceedings.

Booker filed two pretrial motions, one to quash arrest and another to suppress statements. Evidence was taken at two hearings, and the trial court considered all of the evidence received when it ruled on the two motions. At the hearings on these motions, Booker contended that he was illegally detained or "arrested" prior to the time of his formal arrest. Alternatively, he argued that there was no probable cause to arrest even at the time of his formal arrest. Additionally, he argued that the inculpatory statements he made to the police subsequent to his illegal arrest were tainted and must be suppressed.

The State responded by arguing that Booker had not been illegally detained prior to his formal arrest and that there had been probable cause for his arrest at that time. As the hearings progressed, however, the State indicated that it would attempt to show that Booker's inculpatory statements need not be suppressed even if the court should find that the arrest had been made without probable cause. However, the trial court interjected a finding of probable cause for Booker's arrest and the State abandoned its alternative argument.

The testimony given and evidence presented at the pretrial hearings are as follows:

At about 8:30 a.m. on August 7, 1987, while working at the Red Star Laundromat, Booker received a telephone call from a woman who asked him if he knew the whereabouts of Lucy Williams, since she was not at her place of employment. Booker then telephoned Lucy's home and spoke to Lucy's son, Curtis, who informed him that Lucy had been raped and murdered. Booker left the laundromat, drove the one block to 7108 S. Cottage Grove, where Lucy lived, and proceeded to the back of the apartment building. There he was stopped by police investigating the crime scene. Booker then went upstairs to Lucy's third-floor apartment, where he introduced himself as Lucy's boyfriend to a female police officer. This officer asked him a few preliminary questions, including where he worked and how long he knew the victim.

Booker claimed that shortly after arriving he attempted to leave the apartment in order to purchase cigarettes, but that he was prevented from doing so by the female police officer. He then made some coffee and conversed with Lucy's friends and relatives who had gathered at the apartment. Shortly thereafter, at about 10 a.m., Detectives Owens and Lewis arrived at the apartment. Booker informed these detectives that he was Lucy's boyfriend and that he was willing to help the investigation in any way that he could. Thus, when asked to accompany them to the police station, Booker readily agreed.

As they left Lucy's apartment, Booker and Detective Owens walked to a nearby store, where they purchased some cigarettes. Booker then rode with the detectives in their vehicle to Area One Headquarters at 51st and Wentworth, arriving at about 11:30 that morning. Booker sat in the large processing room, where he drank coffee while the two detectives went about their business.

Booker testified that, at some point after his arrival at Area One, he asked the detectives why he was being held. He was informed that he was not being held but that the detectives in charge of the investigation were not back from the crime scene yet and that they wished to speak to him. Booker accepted this explanation and did not refuse to remain at the station. He expressed no desire to leave and did not ask if he could come back at some later time. Booker was not kept in a closed or locked room, he was not handcuffed or restrained in any way and he was not restricted from using the telephone, which he used to call his brother.

While waiting at Area One, Booker was asked if he would allow one of the detectives to inspect his hands, fingernails, shoes, feet and

ankles, but he was not questioned about the killing. Booker permitted the inspection, which apparently revealed nothing noteworthy. Despite this fact, when Detectives Kelly and Ward, who were in charge of the investigation, arrived at Area One sometime after 1 p.m., they apparently had some suspicions concerning Booker's involvement in the murder. Detective Kelly explained that a friend of Lucy's, who was at the scene, had told him that Booker was a heavy drinker who often could not account for his actions and that he was "the jealous type." For this reason, at about 2 p.m., when Detectives Kelly and Ward questioned Booker for the first time concerning his relationship with Lucy and his whereabouts on the previous night, they advised him of his *Miranda* rights before questioning him.

The questioning took place in a conference room on the second floor of Area One station. Booker was not handcuffed or told that he was under arrest. He acknowledged his rights and agreed to speak with them. He told the detectives that on the previous night he had gone to the home of Matilda Clark, another girl friend, at about midnight and had remained there until 7:40 that morning, at which time he left for work.

Following this conversation, Booker agreed to be fingerprinted and to submit to a polygraph test. At about 3 p.m. he went with the detectives to a station at 11th and State, where his fingerprints were taken and a polygraph test was administered. The polygraph test lasted from about 3:20 to 4:20 p.m., after which the detectives and Booker were informed that he had failed the test and that the examiner believed that he had given false answers to questions he had been asked. At this point Booker admitted to the examiner that he had lied, but indicated only that he had driven past Lucy's house a couple times on the previous evening and that he had chosen not to inform the detectives of this fact because he did not want to become involved in the investigation. The examiner relayed this information to the detectives and, at about 5 p.m. as the detectives left the station at 11th and State, they informed Booker that he was under arrest.

Booker was returned to Area One Headquarters and then Detectives Ward and Kelly continued their investigation of the murder by checking Booker's alibi. They went to the home of Matilda Clark and learned from her that Booker had not been at her apartment the entire time between midnight and 7:30 a.m., as he had indicated earlier. After the detectives left Clark's residence, at about 8:30 p.m., they received a message on the police radio notifying them that Booker had made an inculpatory statement. They then returned to Area One to resume questioning Booker.

We note that at this point in the hearing, the trial court indicated that there appeared to have been absolutely no probable cause to arrest Booker for murder. The State then asked to be allowed to present evidence for an alternative method of finding the statements admissible. The trial court declined, interjecting that it would deny the motion to quash, "but not for the reason anybody assumes." The trial court then held that there had been "ample probable cause" to arrest Booker for providing false information to the police and that the motion to quash would be denied on that basis. The trial court did agree, however, to hear additional evidence with respect to the motions.

Subsequently, Detective Glynn testified that he became involved in the murder investigation at about 6:30 p.m. on August 7, 1987, and that he began questioning Booker at about 8 p.m. that same evening. He advised Booker of his rights and, after Booker acknowledged his rights and agreed to speak with him, he questioned Booker about his whereabouts on the previous night. During this questioning, Booker initially admitted, contrary to his previous statements, that he had seen Lucy on the previous night and that she had given him $260. Shortly thereafter, Booker stated that he wanted to "tell the truth about the entire incident." He then confessed that he met with Lucy sometime after 2 a.m. on August 7, 1987, that they had argued and that he beat her to death with a pipe. After receiving this information, Detective Glynn terminated the questioning and notified Detectives Kelly and Ward of the admissions Booker had made.

Detective Ward testified that, after becoming aware of the admissions Booker had made, he and Detective Kelly resumed their questioning of Booker at approximately 11 p.m. on August 7, 1987. At that time, they readvised Booker of his *Miranda* rights, and he again acknowledged these rights and agreed to speak with them. The conversation lasted for approximately 45 minutes, after which the detectives contacted Assistant State's Attorney Inge Fryklund and relayed the information they had received. Fryklund arrived at the station at about 12:15 a.m., and at about 1 a.m. on August 8, 1987, she interviewed Booker in the presence of Detectives Kelly and Ward. She, too, informed Booker of his rights, and he agreed to speak with her, first giving her an oral statement. Following this conversation, he agreed to give his statement to a court reporter. Soon thereafter, a court reporter arrived at the station and Booker made a statement in his presence.

At the close of the court-reported statement, the following colloquy took place between Assistant State's Attorney Fryklund and Booker:

"Q. Are you giving this statement voluntarily to me now?

A. Whatever.

Q. Yes or no.

A. I can't really say. You are asking me what happened and I have told you. So I can't really say. Let me talk with a lawyer and then I will let you know.

Q. Were there any threats or promises made to you?

A. No.

Miss Fryklund: I have no further questions. The time is about three minutes before 4:00 o'clock."

Detective Ward testified that this was the first and only time that Booker ever mentioned an attorney in any manner. Detective Ward also admitted, however, that no effort was made to obtain an attorney for Booker at that time and that, after the court-reported statement was typed, Assistant State's Attorney Fryklund returned to the conference room where Booker was being held and asked if he would read the statement, review it for accuracy and sign it. Although Booker read the statement and orally agreed that it was accurate, he refused to sign it. This refusal was indicated on the statement, and it was noted to have occurred at 5:25 a.m. on August 8, 1987. Miss Fryklund also testified at the hearing, and her testimony was consistent with that of Detective Ward.

At the conclusion of all of the evidence, the trial court denied Booker's motions to quash the arrest and suppress statements. The court did not specifically address the question of whether Booker was actually under arrest prior to his formal arrest, but rather, merely found that there existed, at the time of Booker's formal arrest after the polygraph exam, sufficient probable cause to arrest for obstruction of justice. The court noted that the fact that Booker had not been charged on that basis was insignificant.

The trial court then went on to specifically note that it was not determining whether there had been probable cause to arrest for the charge of murder, finding that such a ruling was unnecessary under the circumstances. The trial court also denied Booker's motion to suppress his statements, up to the point that he made the request for counsel at the close of the court-reported statement. The court ordered that the statement be redacted to eliminate any reference to Booker's response to the assistant State's Attorney's questions or comments which may have occurred after that request for counsel.

After a jury trial, which commenced on January 23, 1989, Booker was found guilty of first-degree murder. The only alleged errors with respect to this trial are: (1) that, contrary to its prior ruling, the trial court allowed Assistant State's Attorney Fryklund to testify that Booker read and found accurate the court-reported statement and then allowed the entire, unredacted copy of the court-reported statement to be sent to the jury, and (2) that the trial court allowed the jury to view a gruesome police photograph depicting Lucy Williams' bloody and beaten head.

We shall first address the question of whether the trial court erred when it ruled on Booker's pretrial motions. This inquiry actually involves three issues: (1) whether Booker was placed "under arrest" prior to his formal arrest; (2) whether probable cause to arrest existed at the time of Booker's formal arrest; and (3) whether Booker's statements should have been suppressed as the fruit of an illegal arrest. The trial court implicitly, if not specifically, found that Booker was not "under arrest" or illegally detained prior to the time of his formal arrest. The trial court also found that there had been probable cause to arrest Booker for obstruction of justice, whether or not there had been probable cause to arrest for the offense of murder. Consequently, the trial court denied the motions to quash Booker's arrest and suppress his statements.

After reviewing the record, this court does not believe that Booker was illegally seized or "under arrest" when he first accompanied the detectives to the police station. However, we do find that his detention became unlawful at some point prior to his formal arrest. Furthermore, we find that, at the time of Booker's arrest, probable cause did not exist.

■ Initially, we note that a reviewing court may not disturb the ruling of a trial court on a motion to suppress unless the decision is against the manifest weight of the evidence. (*People v. Holloway* (1981), 86 Ill. 2d 78, 426 N.E.2d 871; *People v. Vega* (1990), 203 Ill. App. 3d 33, 560 N.E.2d 983.) Evidence may be suppressed if it is the fruit of a seizure and custodial interrogation which violates the fourth amendment, *i.e.*, where the intrusion or detention was unsupported by probable cause. (*Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.) The salient question when deciding whether a seizure has taken place for fourth amendment purposes is not whether the officer's conduct was reasonable, but whether a reasonable, innocent person would have considered himself arrested or not free to leave under the circumstances. (*Hicks v. United States* (1967), 382 F.2d 158; *People v. Reynolds* (1983), 94 Ill. 2d 160, 445

N.E.2d 766.) In the present case there appears to be no dispute that the police did not possess probable cause to arrest Booker at the time that he was transported from Lucy's apartment to the police station. Thus, the question is whether a seizure took place at this time.

In several cases, courts have held that when the police seek out a possible suspect and, essentially, enforce his presence at the police station for questioning, an arrest has taken place, whether or not the suspect was informed that he was under arrest. (See *People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103; *People v. Sturdivant* (1981), 99 Ill. App. 3d 370, 425 N.E.2d 1046.) However, these cases are inapposite to the present case.

■ Here, it is clear that the police did not seek out Booker, but that Booker, completely voluntarily, appeared at the residence of Lucy Williams, made his presence known to the police, informed them of his relationship to Lucy, and then offered his assistance in their investigation. Although Booker was not merely questioned briefly at Lucy's residence, but was transported in a police car to the police station, these factors, though relevant, are not dispositive of the question of whether Booker was seized. More important is the question of whether, under the totality of the circumstances, it appears that the person's presence at the station was truly voluntary or was compelled. To hold otherwise would effectively prohibit any in-station questioning of a potential suspect, whether voluntary or not, and would severely hamper a police officer's ability to conduct an investigation.

In this case there was sufficient evidence presented at the pretrial hearing to support the notion that Booker's accompaniment of the police to the station was voluntary. Under these circumstances it seems unlikely that a reasonable person, innocent of a crime, would have believed that he was under arrest. Therefore, we do not find it to be against the manifest weight of the evidence to find that a seizure did not occur at the time Booker left Lucy's apartment.

In further support of this conclusion, we note Booker's treatment during his transport and upon his arrival at the police station. In this case Booker was not handcuffed or restrained. He was allowed to go to a store to purchase cigarettes and, upon arrival at the station, was not placed in a small, locked interrogation room, but rather, sat in the large processing room while the detectives went about their normal activities. He was not subjected to repetitious interrogation, and he was allowed to use the telephone, which was readily available to him. Consequently, under the totality of circumstances, we do not believe that Booker, at least initially, was unlawfully seized.

■ However, just as a lawful stop of a suspect may be transformed into an unlawful seizure if the detention lasts for an unreasonable length of time (*People v. Lippert* (1982), 89 Ill. 2d 171, 432 N.E.2d 605) so, too, we believe, in this case, Booker's voluntary cooperation with the police investigation progressed into an unlawful detention and involuntary seizure with the passage of time. As stated in our recent case, *People v. Young* (1990), 206 Ill. App. 3d 789, 801, "the fact that a defendant initially accedes to a police request to accompany them to the police station does not legitimize the treatment of defendant after he arrived at the station."

■ Booker was taken to the police station ostensibly so that he could provide the investigative detectives with information concerning Lucy, as well as her habits and friends, to aid in the investigation. However, as Booker was required to wait at the station from 11:30 a.m. until approximately 2 p.m., it became evident that his presence at the station was not for that stated purpose and the voluntariness of his stay became more questionable. Booker was not told that he could leave or given the option of returning at a time when the detectives in charge would be available. It appeared that Booker became the focus of the investigation at some point in time since he was asked to allow an inspection of his hands and feet. In fact, Booker testified that after a period of time, he asked some detectives at the station why he was being held. This indicates Booker's subjective belief that he was no longer free to go and that he was being retained at the police station against his will. While it is true that an individual's subjective belief as to his arrest status is not dispositive, when ascertainable, it is a legitimate consideration (*People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870), and we, too, must conclude that there was a certain " 'quality of purposefulness' " to Booker's continued retention, which made it appear to be an " 'expedition for evidence' " that would supply sufficient probable cause. (See *People v. Townes*, 91 Ill. 2d at 37, quoting *Dunaway v. New York*, 442 U.S. at 218, 60 L. Ed. 2d at 839, 99 S. Ct. at 2259.) For this reason, we find that Booker was seized within the meaning of the fourth amendment prior to his formal arrest.

■ We further find that probable cause did not exist for Booker's arrest at this time or at the time of his formal arrest. Probable cause for arrest exists when facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested has committed the offense. (*People v. Lippert* (1982), 89 Ill. 2d 171, 432 N.E.2d 605.) Mere suspicion that the person arrested

has committed the offense is insufficient. (*People v. Reynolds* (1983), 94 Ill. 2d 160, 445 N.E.2d 766.) Furthermore, a probable cause determination may not be based upon the results of a polygraph examination. *People v. Jones* (1987), 157 Ill. App. 3d 1006, 511 N.E.2d 1215.

■ In this case, even if we were to overlook our ruling that Booker was seized prior to his formal arrest, at no time prior to the formal arrest did the police obtain sufficient evidence to link Booker to the crime of Lucy's murder. Detective Kelly testified only that he was informed that Booker was a heavy drinker, that he sometimes could not account for his actions and that he was the jealous type. While these facts may have provided the detective with a reason to suspect Booker, they fall short of probable cause.

Also, the circumstances of the murder did not suggest any particular perpetrator. Lucy was found in an alley behind her home, beaten to death, with her purse missing. These facts do not even lead one to conclude that the perpetrator was someone Lucy knew and, since there were no known witnesses to the murder, the list of possible suspects was limitless. Additionally, Booker's answers to preliminary questioning did not implicate him in any way. The inspection of his hands and feet, his fingerprints and even his polygraph results did not provide any substantive evidence that would provide a basis for finding probable cause to arrest for the crime of murder.

■ Furthermore, we reject the trial court's finding that Booker's arrest was supported by probable cause to arrest for obstruction of justice. There are three reasons: (1) because we found that Booker was illegally seized prior to his submission to the polygraph test, which the court used as the basis for finding probable cause to arrest for the crime of obstruction of justice, (2) because we find that there was insufficient evidence to support a finding of probable cause to arrest for obstruction of justice since Booker's false statement about being in the vicinity of Lucy's apartment did not go beyond the limits of denying involvement and, thus, were merely an exculpatory denial (see *People v. Brooks* (1977), 51 Ill. App. 3d 800, 367 N.E.2d 236), and (3) because we do not believe that a court may find, in retrospect, that probable cause may have existed for another offense, uncontemplated by the police at the time of arrest, to support the arrest for which no probable cause existed (see *People v. Nash* (1979), 78 Ill. App. 3d 172, 397 N.E.2d 480).

Having found that Booker's arrest was unlawful, the next consideration is whether the subsequent inculpatory statements made by Booker must be suppressed as the fruit of his unlawful arrest. In this appeal Booker argues that his statements are a direct result of the il-

legal detention and, as such, should have been suppressed. The State, on the other hand, argues that, if this court finds Booker's arrest to have been illegal, this court should still find Booker's statements admissible. This is because the fact that an illegal seizure took place does not automatically require the exclusion of a subsequent confession. (*People v. Vega* (1990), 203 Ill. App. 3d at 44.) If a confession is not obtained as a result of an exploitation of the illegal arrest, the admissions or statements may be sufficiently attenuated from the arrest so as to be purged of the taint of that arrest. *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407; *People v. Vega*, 203 Ill. App. 3d 33, 560 N.E.2d 983.

As noted earlier, the State attempted to make this same argument to the trial court below but was prevented from doing so by the court's ruling. It is unclear, therefore, whether the State could have presented any additional evidence concerning this matter. For this reason, this court chooses not to rule on the admissibility of the inculpatory statements until the lower court has had the opportunity to hear any such additional evidence that may be proffered by the State and it considers whether any attenuating circumstances occurred which would have acted to break the causal link between the statements and the illegal arrest. Consequently, we reverse Booker's conviction and remand so that further proceedings may be had for that purpose.

Because of our decision to reverse Booker's conviction, we find it unnecessary to discuss the remaining two issues on appeal, which question the fairness of the trial Booker received, based on the admission of certain evidence.

Reversed and remanded.

LORENZ, P.J., and GORDON, J., concur.