**Charles BOOKER, Plaintiff,**

**v.**

**James WARD and Thomas Kelly, Defendants.**

**No. 90 C 4602.**

United States District Court, N.D. Illinois, Eastern Division.

Oct. 13, 1995.

Howard P. Morris, Paul A. Tanzillo, Johnson & Bell, Ltd., Cecile L. Singer, Chicago, Illinois, for plaintiff.

Michael P. Monahan, Patricia Jo Kendall, City of Chicago Law Dept., for defendants.

## MEMORANDUM OPINION AND ORDER

HART, District Judge.

Plaintiff Charles Booker claims that defendants Thomas Kelly and James Ward, Chicago police detectives, lacked probable cause when, on August 7, 1987, they arrested him for the murder of Lucy Williams. An Illinois court so held in Booker's criminal prosecution, *see People v. Booker*, 209 Ill.App.3d 384, 154 Ill.Dec. 211, 218, 568 N.E.2d 211, 218 (1st Dist.1991) ("*Booker I*"). The Appellate Court remanded the case for a hearing on whether Booker's confession to the murder after his arrest was admissible. In a second appeal, after the trial court held that it was, the Appellate Court again reversed, holding the confession was obtained as a result of the unlawful arrest. *People v. Booker*, No. 92–0956, unpublished (1st Dist.1994) ("*Booker II*"). Defendants were not parties to that case, and it is undisputed that they are not bound by the Appellate Court holdings. *See Kraushaar v. Flanigan*, 45 F.3d 1040, 1050–51 (7th Cir.1995); *Booker v. Ward*, 888 F.Supp. 869, 877 (N.D.Ill.1995).

Defendants have moved for summary judgment on the ground that the undisputed facts show they had probable cause for the arrest. Alternatively, they contend they have qualified immunity because the law was not clear

that the facts of which they had knowledge were not sufficient to constitute probable cause or because any mistake they made regarding the existence of probable cause was reasonable in light of the then established law. Plaintiff contends there are disputed facts regarding when he was arrested and further contends that, construing the evidence in his favor, the facts known to the police officers when he was arrested were insufficient to support probable cause or qualified immunity.

This case is complicated by the question of whether the defendants, rather than other officers, can be responsible or liable for the arrest of plaintiff if that arrest occurred before they formally placed him under arrest. The questions to be resolved are whether factual issues exist (1) with respect to defendants' responsibility for plaintiff's arrest before 5:00 p.m. on August 7, 1987 as well as (2) the existence of probable cause to formally arrest plaintiff, and, in any event, (3) whether qualified immunity applies to defendants' conduct with respect to the arrest of plaintiff.

■■■ On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. *Oxman v. WLS–TV,* 846 F.2d 448, 452 (7th Cir.1988); *Jakubiec v. Cities Service Co.,* 844 F.2d 470, 471 (7th Cir.1988). The burden of establishing a lack of any genuine issue of material fact rests on the movant. *Id.* at 473. The non-movant, however, must make a showing sufficient to establish any essential element for which he will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The movant need not provide affidavits or deposition testimony showing the non-existence of such essential elements. *Id.* at 324. Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. *See Covalt v. Carey Canada, Inc.,* 950 F.2d 481, 485 (7th Cir.1991); *Collins v. Associated Pathologists, Ltd.,* 844 F.2d 473, 476–77 (7th Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988). As the Seventh Circuit has summarized:

The moving party bears the initial burden of directing the district court to the determinative issues and the available evidence that pertains to each. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 [106 S.Ct. 2548, 2553, 91 L.Ed.2d 265] (1986); *id.* at 325[, 106 S.Ct. at 2554] ("the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case"). Then, with respect to issues that the non-moving party will bear the burden of proving at trial, the non-moving party must come forward with affidavits, depositions, answers to interrogatories or admissions and designate specific facts which establish that there is a genuine issue for trial. *Id.* at 324[, 106 S.Ct. at 2553]. The non-moving party cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue. *Id.* The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 [106 S.Ct. 1348, 1355, 89 L.Ed.2d 538] (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 [106 S.Ct. 2505, 2512, 91 L.Ed.2d 202] (1986).

*Selan v. Kiley,* 969 F.2d 560, 564 (7th Cir. 1992).

■■■ Plaintiff brings a false arrest claim pursuant to 42 U.S.C. § 1983. In order to succeed on this claim, the burden is on plaintiff to prove that he was arrested without

probable cause. In determining whether there was probable cause for an arrest, it must be considered

whether "the facts and circumstances within the officer['s] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent person in believing that an offense has been committed." *Hughes v. Meyer*, 880 F.2d 967, 969 (7th Cir.1989), *cert. denied*, 495 U.S. 931 [110 S.Ct. 2172, 109 L.Ed.2d 501] (1990). "Probable cause requires more than bare suspicion, but need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false." *Id.*

*Maltby v. Winston*, 36 F.3d 548, 556 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 2576, 132 L.Ed.2d 827 (1995). *Accord United States v. Garza–Hernandez*, 623 F.2d 496, 499 (7th Cir.1980). "Probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *United States v. Gilbert*, 45 F.3d 1163, 1166 (7th Cir.1995) (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983)). *Accord Gramenos v. Jewel Cos.*, 797 F.2d 432, 439 (7th Cir.1986), *cert. denied*, 481 U.S. 1028, 107 S.Ct. 1952, 95 L.Ed.2d 525 (1987). "In recognition of the endless scenarios confronting police officers in their daily regimen, courts evaluate probable cause 'not on the facts as an omniscient observer would perceive them but on the facts as they would have appeared to a reasonable person *in the position of the arresting officer*—seeing what he saw, hearing what he heard.'" *Sheik–Abdi v. McClellan*, 37 F.3d 1240, 1246 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 937, 130 L.Ed.2d 882 (1995) (quoting *Mahoney v. Kesery*, 976 F.2d 1054, 1057 (7th Cir.1992)).

■ Although considered subjectively in terms of the facts the officer would have had before him or her, whether those facts constituted probable cause is an objective standard based on a reasonable police officer; whether the police officer actually believed he or she had probable cause or had other motives (good or bad) for arresting the person are

not considerations. *Sheik–Abdi*, 37 F.3d at 1247; *Mark v. Furay*, 769 F.2d 1266, 1269 (7th Cir.1985); *United States v. Marin*, 761 F.2d 426, 432 (7th Cir.1985) (citing *United States v. Prim*, 698 F.2d 972, 975 (9th Cir. 1983)).

Drawing all reasonable inferences and resolving all disputes in plaintiff's favor, the facts are as follows. On the morning of August 7, 1987, Lucy Williams's body was found behind 7108 South Cottage Grove in the City of Chicago. Ward and Kelly were assigned to investigate and arrived at the scene at 8:45 a.m. Williams's body was alongside her car with the car door open. She was in business attire, but her pants and underwear were pulled down to her ankles and a car mat covered her groin area. Her purse was not in her car or near her body and was not located during the initial investigation. Williams had been beaten extensively about the head and blood was splattered in the car, alongside it, and on one side of the car. There was a tooth on the car seat that was never identified.

The physical evidence indicated that Williams had been beaten for a protracted period of time. It would have been reasonable for the officers to conclude that the physical evidence indicated a crime of passion committed by someone who was angry or in a rage. Also, they could have reasonably concluded that a person who had randomly killed and possibly raped Williams would not have been concerned with her genital area being exposed and therefore would not have covered her groin area with the car mat. Thus, it would also have been reasonable to surmise that the evidence indicated that the killer was someone who knew Williams. There were no bruises in her genital area and no evident semen.

Given the overkill evident from the numerous head wounds and the lack of bruising in the genital area, a reasonable officer could have concluded that, despite her pants being pulled down, it was unlikely that the assault was sexual in nature, but instead was probably an act of rage by someone who knew Williams and was angry with her. Although the officers could have reasonably concluded from the physical evidence that Williams

likely knew her murderer; there was no physical evidence pointing to plaintiff in particular.

There was also evidence at the scene of the crime that indicated the attack (or at least a confrontation) had likely been planned by someone who had been there waiting for Williams to go to her car in the morning. One of the tires on Williams's car was flat and had a piece of metal in it, indicating that it may have been flattened in anticipation of Williams's arrival. A beer can in a brown bag was found resting at the bottom of a stairwell near the one leading to Williams's apartment. However, there was also a beer can further up the stairwell which could indicate the cans were merely there because a resident had been drinking on the back stairs.

Defendants interviewed a number of people at the crime scene, including relatives and neighbors of Williams. They interviewed Williams's 16-year-old son Curtis who lived with her. He said that, during the evening of August 6, Williams had gone out with Howard Oliver, a former boyfriend, but had returned at 8:30 p.m. He had last seen her alone in bed at 10:30 that night. A neighbor had heard a scream between 4:00 and 4:30 a.m. and the parties agree it could have reasonably been assumed that this was the time of the murder. Ward testified that Curtis told him Williams normally left for work at 4:00 a.m. However, this fact was not included in the police report summarizing the interview of Curtis. Also, Booker testified that Williams's hours were variable. However, in ¶ P12 of Plaintiff's Local Rule 12(N) Statement, plaintiff concedes that Kelly drew the conclusion that the killer likely knew Williams's work schedule and was waiting for her to come to her car.

■ Plaintiff argues that the detectives each had less than one year's experience as a detective (plaintiff ignores that they had 16 and 18 years' experience as police officers before becoming detectives) and that it can be inferred from the record that neither detective actually drew the aforementioned conclusions prior to plaintiff's arrest. Probable cause, however, is not determined on the basis of the actual, subjective reasoning of the police officer making the arrest, but is based on what a reasonably well trained police officer could have reasonably surmised had he or she observed and known what the actual arresting officer observed and knew. See United States v. Sleet, 54 F.3d 303, 307 (7th 1995) (quoting United States v. Leon, 468 U.S. 897, 922 n. 23, 104 S.Ct. 3405, 3420 n. 23, 82 L.Ed.2d 677 (1984)); Maltby, 36 F.3d at 555.

On the morning of August 7, Booker received a telephone call at about 8:30 a.m. from a person at Williams's place of employment inquiring about her absence. Booker called Williams's home and was informed she had been killed. He then went to her apartment. Shortly after arriving, Booker indicated that he wanted to leave to purchase cigarettes, but a female police officer prevented him from leaving. Later, at Kelly's request, officer Owens asked Booker to go with him to Area One headquarters so he could be questioned about Williams's friends and habits away from her family and where police mug books would be available. Booker was told that he would be driven back to Williams's apartment, where his car was located.

Booker agreed to accompany officers Lewis and Owens, expressing that he wanted to help in any way he could. Booker was not placed in handcuffs nor told he was under arrest. During the trip to Area One, the officers stopped for cigarettes and to purchase a soft drink. They arrived at the station between 11:30 and 11:45 a.m. and Booker waited on the second floor for defendants to arrive. At one point Booker asked why he was being held and the officers told him he was not being held, but directed him to wait for defendants to come. Booker was permitted to use the bathroom and a telephone in the lineup room, though an officer sat at the desk as he used the telephone. Neither Owens nor Lewis expressly told Booker that he was free to leave or free to refuse to answer questions.

While Booker was waiting, Owens and another officer examined his fingernails, shoes, and feet for blood. They found nothing. Defendants deny, and there is no proof, that

they were told of this examination before they arrested Booker.

While Booker went to Area One and waited there, defendants continued to question neighbors, friends, and relatives of Williams. Williams's cousin Elaine Sims told them that Booker had lived with Williams and that she had asked him to move out only three weeks earlier, telling him she no longer wanted to marry him. Sims also told them that Williams had been pregnant with Booker's child and had an abortion, but told Booker it was a miscarriage. She did not state that Booker had discovered this lie. Sims also said that Booker was very jealous, a heavy drinker, and often would forget what he had done while drinking. However, she did not state that he was violent or that he had ever threatened to harm Williams. Defendants also interviewed Williams's former husband who said he had last spoken with Williams about 10 days before she died. Approximately fourteen witnesses had been interviewed before defendants returned to the station to interview Booker.

Defendants arrived at Area One between 1:00 and 1:30 p.m., but did not begin interviewing Booker until approximately 2:00 p.m. At that point, Booker was waiting in the lineup room and that is where he was questioned. At the beginning of the questioning, defendants read Booker a standard *Miranda* warnings form and Booker signed the form. Booker was not expressly told that he was free to leave, but the *Miranda* warnings advised him of his right to not answer questions. Booker informed the officers that he had talked to Williams approximately 9:00 p.m. on the night before she was killed. He did not mention having any other contact with her that evening (other than an unsuccessful attempt to reach her by phone at approximately 8:00 p.m.), nor did he mention driving past her apartment building that evening or after midnight. Booker related that he had been drinking with friends throughout the evening and that he slept at the home of the girlfriend he was living with. He said he did not leave that home until 7:40 a.m. on August 7 when he left for work. Booker expressly denied knowledge of or participation in the killing of Williams. During the

questioning, defendants had police records checked and were informed that Booker did not have a criminal record.

The officers requested that Booker submit to being fingerprinted and take a polygraph examination at police headquarters. At the time of this request, he was not expressly told that he could refuse or that he could simply leave. Throughout the time at Area One and while being transported to police headquarters, Booker was not handcuffed nor was any physical force used or threatened. At police headquarters, Booker was fingerprinted and then escorted in an elevator to where the polygraph examination was given. The polygraph examiner read Booker a form that repeated the *Miranda* warning and indicated participation in the examination was voluntary. Booker signed the form, acknowledging that he was voluntarily taking the examination. The examination took place from approximately 3:20 to 4:20 p.m. After the examination, the examiner informed defendants (outside Booker's presence) that it was his opinion that Booker was being untruthful and uncooperative and trying to beat the machine. With defendants' approval, the examiner then informed Booker that he could not pass Booker on the test. Booker subsequently admitted he had lied in that he had driven by Williams's apartment twice during the evening/morning of August 6/7. Defendants then expressly informed Booker he was under arrest at approximately 5:00 p.m. He confessed to the murder during the evening.

Plaintiff contends that he was arrested as of the time that defendants gave him his first set of *Miranda* warnings at Area One. This was approximately 2:00 p.m. Defendants contend that he was not arrested until expressly informed he was under arrest which was about 5:00 p.m. The only additional incriminating facts learned during the time between these two marking points was that Booker was in the vicinity of Williams's apartment during the evening before/morning of the murder and that he initially lied about not being there. These two facts are not part of the probable cause determination if plaintiff was already under arrest prior to

the follow up questioning after the polygraph examination being completed.

An arrest can occur without a police officer formally announcing that the person is under arrest. Whether a person has been arrested is determined objectively; a person has been arrested "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Burns*, 37 F.3d 276, 279 (7th Cir.1994), *cert. denied*, ___ U.S. ___, 115 S.Ct. 2592, 132 L.Ed.2d 840 (1995) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988)). *Accord United States v. McCarthur*, 6 F.3d 1270, 1275–76 (7th Cir.1993); *United States v. Lennick*, 917 F.2d 974, 977 (7th Cir.1990).

> [C]ertain factors have emerged as being probative of whether a reasonable person would have felt free to leave. These include: whether the encounter took place in a public area or whether police removed the person to another location; whether the police informed the person that she was not under arrest and was free to leave; whether police indicated to the person that she was suspected of a crime or was the specific target of police investigation; whether the person was deprived of documents without which she could not continue on her way, such as a driver's license or a train ticket; and whether there was physical touching, display of weapons, or other threatening behavior on the part of police that would communicate to a reasonable person that she was not free to end the encounter.

*McCarthur*, 6 F.3d at 1276. The length of questioning is also a factor to consider. *Lennick*, 917 F.2d at 977.

The Appellate Court concluded in *Booker I*, that Booker was under arrest prior to 5:00 p.m. Assuming that conclusion to be correct, is his arrest attributable to the conduct of defendants Ward and Kelly? Booker voluntarily went to the crime scene to provide information. He agreed to go to the police station to answer questions. He waited a short period and was questioned for a short period after receiving *Miranda* warnings. He agreed to take a polygraph test before which he was again given *Miranda* warnings. These facts are not determinative of custodial questioning. *See Rodgers v. Lincoln Towing Service, Inc.*, 771 F.2d 194, 199 (7th Cir.1985); *Feltrop v. Delo*, 46 F.3d 766, 773 (8th Cir.1995); *United States v. Cota*, 953 F.2d 753, 758–59 (2d Cir.1992).

It is undisputed that at one point Booker was told he was not being held, but was simultaneously told to wait for defendants to arrive. There is no evidence, however, that Ward or Kelly knew that Booker had been so informed. While at Area One, Booker was examined to see if blood had been splattered on him. This included a close examination of his fingers and taking off his shoes. This clearly implied Booker was a possible suspect. Again, however, neither Kelly nor Ward was aware this had happened. Also, although belief that one is a suspect may contribute to a reasonable belief that one is in custody, it is not determinative. *Stansbury v. California*, ___ U.S. ___, ___, 114 S.Ct. 1526, 1530, 128 L.Ed.2d 293 (1994); *United States v. Jones*, 21 F.3d 165, 170 (7th Cir.1994).

Booker points to the fact that he was given *Miranda* warnings, contending a reasonable person would interpret that as at least a factor indicating he or she is under arrest. However, in neither *Booker I* nor *Booker II* did the Appellate Court rely on or even refer to the giving of *Miranda* warnings as indicative of an arrest. Moreover, federal law is that the giving of *Miranda* warnings is not a basis for finding a person to be in custody. *See Davis v. Allsbrooks*, 778 F.2d 168, 172 (4th Cir.1985); *United States v. Charles*, 738 F.2d 686, 693 n. 6 (5th Cir.1984); *United States v. Lewis*, 556 F.2d 446, 449 (6th Cir.), *cert. denied*, 434 U.S. 863, 98 S.Ct. 193, 54 L.Ed.2d 137 (1977). The giving of *Miranda* warnings relates to the voluntariness of statements and is encouraged. *United States v. Lewis*, 556 F.2d 446, 449 (6th Cir.1977) ("The precaution of giving *Miranda* rights in what is thought could be a non-custodial interview should not be deterred by interpreting the giving of such rights as a restraint on the suspect, converting a non-custodial interview into a custodial interrogation for *Miranda* purposes.").

The conduct of Ward and Kelly was insufficient to change Booker's voluntary cooperation with the police into an arrest by defendants Ward and Kelly before 5:00 p.m. There is no dispute that Booker's initial trip to the police station was voluntary, as the Appellate Court noted. *Booker I*, 154 Ill. Dec. at 217, 568 N.E.2d at 217. The time spent at the police station was not lengthy when it is considered that defendants had to first complete their investigation at a murder scene. The initial interview of Booker lasted no more than an hour and the polygraph examination another hour. Booker, therefore, was not subjected to lengthy questioning. Most importantly, there was no use of or show of force indicating that Booker was not free to go and, at one point, he was actually told that he was free to go. Based on the facts assumed to be true for purposes of summary judgment, no reasonable factfinder could conclude that Booker was placed under arrest by the acts of the defendants before 5:00 p.m. *Cf. Jones*, 21 F.3d at 170; *Allsbrooks*, 778 F.2d at 170–72.

The conclusion that Booker was not placed under arrest by defendants prior to 5:00 p.m. is not contrary to the holdings of the Appellate Court in either *Booker I* or *Booker II*. In *Booker I*, the Court only singled out and placed special emphasis on the examination of Booker's hands and feet as indicative of a custodial investigation. Without this incident, for which the defendants were not responsible, it does not appear that the Court would have found an arrest before 5:00 p.m.

■■■ The evidence is that Booker was formally arrested by Ward and Kelly after the polygraph examination and his admission that he had lied. Unlike Illinois law, which does not permit polygraph examination results to be support for probable cause, *see People v. Booker*, 154 Ill.Dec. at 218, 568 N.E.2d at 218, under federal law such results can be considered in determining whether probable cause existed. *See Bennett v. City of Grand Prairie, Texas*, 883 F.2d 400, 405–06 (5th Cir.1989); *Prokey v. Watkins*, 942 F.2d 67, 73 (1st Cir.1991); *Marx v. Gumbinner*, 905 F.2d 1503, 1507 (11th Cir.1990).

At the point of the arrest, the officers had the additional knowledge that Booker had been untruthful about his whereabouts the night/morning of the murder. He had admitted having lied about seeking out Williams that night. Lying in response to police questioning is a strong indicator of guilt, *see United States v. Leung*, 929 F.2d 1204, 1208 (7th Cir.), *cert. denied*, 502 U.S. 906, 112 S.Ct. 297, 116 L.Ed.2d 241 (1991), particularly when it is lying about an incriminating fact. The evidence supported that Williams's murderer knew her and her work schedule. Booker was one of the few people known to fall into that category. Moreover, he was known to be very jealous, thus providing a motive for the murder. With the additional evidence that he had lied about being in the area the night/morning of the murder, a probability existed that he had committed the murder. The officers, therefore, had probable cause to arrest him and cannot be held liable for a constitutional violation.

■■■ Although it does not appear that any material fact is in dispute, even if it were found that there are disputed facts regarding the existence of probable cause, it still would have to be determined whether defendants have qualified immunity. On this issue, plaintiff bears the burden of citing the existence of clearly established authority, on closely analogous facts, which, in August of 1987, would alert a reasonable police officer that his conduct toward plaintiff was clearly unlawful. *Hannon v. Turnage*, 892 F.2d 653, 656 (7th Cir.), *cert. denied*, 498 U.S. 821, 111 S.Ct. 69, 112 L.Ed.2d 43 (1990). Qualified immunity analysis is a two step inquiry: whether the law was clearly established and, if so, whether the conduct was objectively reasonable. *Biddle v. Martin*, 992 F.2d 673, 675 (7th Cir.1993).

■■■ Plaintiff points to no existing law with closely analogous facts (prior to *Booker I* in 1991) that would have clearly established that the facts known to defendants would have required them to know that their conduct was unlawful. Plaintiff contends, rather, that the standard for qualified immunity and probable cause are essentially merged and that a factual issue with respect to probable cause would require a trial of both issues. Recent Seventh Circuit authority is to

the contrary. *Maltby v. Winston,* 36 F.3d at 557. The standard for qualified immunity is different from the standard for probable cause. In *Sheik–Abdi v. McClellan,* 37 F.3d 1240, 1246 (7th Cir.1994), the Court stated that

> even in cases where there was no probable cause for the arrest, by holding that 'if officers of reasonable competence could disagree' on whether there was probable cause, the defendant would be immune from damages liability. In other words, only if no reasonable officer could have mistakenly believed that he had probable cause to arrest is the immunity forfeited.

If probable cause did not exist, the officers are nevertheless entitled to qualified immunity if their mistake as to the existence of probable cause for an arrest was reasonable despite the pertinent law that was clearly established as of the August 1987 incident. *Maltby,* 36 F.3d at 557; *Eversole v. Steele,* 59 F.3d 710, 717–18 (7th Cir.1995); *Burns v. Reed,* 44 F.3d 524, 529 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2583, 132 L.Ed.2d 832 (1995). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Eversole,* 59 F.3d at 717 (quoting *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991)).

■ If the facts create a dispute as to whether Booker could have reasonably believed he was free to leave, it still has to be considered that Kelly and Ward were not aware of all that had happened prior to their arrival at the police station. They did not know of officers telling Booker not to leave the scene of the crime and to continue to wait at the police station. They did not know that Booker's fingernails, socks, and feet had been examined. To the extent such facts would be necessary to a finding of being in custody, Kelly and Ward would still be entitled to qualified immunity because, based on the information known to them, they had a reasonable basis for believing Booker was not placed under arrest until they formally placed him under arrest, and that arrest was not unlawful.

Defendants Ward and Kelly are entitled to claim qualified immunity.

Defendants' motion for summary judgment will be granted.

IT IS THEREFORE ORDERED that defendants' motion for summary judgment [94] is granted. The Clerk of the Court is directed to enter judgment in favor of defendants and against plaintiff dismissing his cause of action with prejudice.