**Charles BOOKER, Plaintiff–Appellant,**

v.

**James WARD and Thomas Kelly, Chicago Police Detectives, Defendants–Appellees.**

No. 95–3688.

United States Court of Appeals, Seventh Circuit.

Argued June 6, 1996.

Decided Aug. 29, 1996.

Cecile Singer, Kenneth N. Flaxman (argued), Chicago, IL, H. Patrick Morris, Kevin J. Greenwood, Paul A. Tanzillo, Johnson & Bell, Chicago, IL, for Plaintiff–Appellant.

Kelly R. Welsh, Office of the Corporation Counsel, Chicago, IL, Lawrence Rosenthal, John F. McGuire, Thaddeus Machnik, Benna R. Solomon, Patricia J. Kendall (argued), Susan S. Sher, Michael P. Monahan, Office of the Corporation Counsel, Appeals Division, Chicago, IL, for Defendants–Appellees.

Before BAUER, ROVNER, and DIANE P. WOOD, Circuit Judges.

BAUER, Circuit Judge.

On August 7, 1987, the defendants arrested Charles Booker for the murder of his fiancee, Lucy Williams. Booker confessed shortly after his arrest, and a jury convicted him of first degree murder. The Illinois Appellate Court found that probable cause did not exist to arrest Booker, reversed the conviction, and remanded the case for a hearing on the admissibility of Booker's confession. *People v. Booker*, 209 Ill.App.3d 384, 393, 395, 154 Ill.Dec. 211, 218, 219, 568 N.E.2d 211, 218, 219 (Ill.App. 1 Dist.1991) (*"Booker I"*). After the trial court found the confession sufficiently attenuated from the arrest to be admissible, the Appellate Court again reversed, holding that Booker's confession was the product of an unlawful arrest. *People v. Booker*, No. 92–0956, unpublished (Ill.App. 1 Dist.1994). The trial court then dismissed the charges upon the prosecution's motion for a *nolle prosequi* order.

Despite his confession, in August 1990 Booker filed an unlawful arrest claim in federal court pursuant to 42 U.S.C. § 1983, seeking damages from Chicago Police Detectives Thomas Kelly and James Ward for his allegedly unlawful arrest and imprisonment "for crimes these defendants know plaintiff did not commit." In February 1992, the district court dismissed the case with leave to reinstate within 60 days after disposition of the state court proceedings. The court reinstated the case in November 1994. In February 1995, Booker filed his amended complaint naming Owens and Lewis as defendants in his unlawful arrest claim.[1] The district court granted Owens' and Lewis' motion to dismiss because Booker had not added them as defendants within the two-year statutory limitations period for § 1983 claims. The district court also granted Kelly's and Ward's motion for summary judgment, holding that probable cause existed for them to arrest Booker and that even if it did not, they were entitled to qualified immunity for their actions. We affirm.

## BACKGROUND

On the morning of August 7, 1987, Lucy Williams' partially clothed body was discovered in a parking lot behind her apartment building. She had been bludgeoned to death between 4:00 a.m. and 4:30 a.m., the time she usually left for work. Williams' pants and underpants lay around her ankles. A rubber floor mat from Williams' car covered her groin area. Williams had no bruises in her genital area, nor was any semen found.

Kelly and Ward arrived at the scene at 8:45 a.m. Based on their experience and the physical evidence, the detectives concluded that the killer likely knew Williams. The "overkill" evident from the numerous head wounds, and the lack of bruising and semen in the genital area, indicated that the attack was not a sexual assault, but instead was an act of rage against Williams. A random killer likely would not have placed the car mat over Williams' groin to prevent the exposure of her genital area. A piece of metal protruding from the flat front left tire of Williams' car indicated that the killer may have planned the attack and wished to prevent Williams from leaving the area. This

---

1. Booker also named Detective Steven Glynn as a defendant in the unlawful arrest claim, and asserted an Illinois state law malicious prosecution claim against the City of Chicago and Detectives Ward and Kelly. He does not appeal the district court's order dismissing Glynn from the case, nor does he appeal the dismissal of the malicious prosecution claim.

evidence of premeditation suggested that the killer knew Williams' work schedule.

Ward and Kelly interviewed a number of people at the crime scene. Williams' son Curtis told the detectives that his mother had returned from a date the previous evening between 8:30 p.m. and 8:45 p.m. Curtis last saw his mother alone in her bed at around 10:30 p.m. A neighbor told Ward and Kelly that she heard a scream between 4:00 and 4:30 that morning, the time Williams usually left for work.

That morning, Booker received a telephone call at about 8:30 a.m. from a person at Williams' workplace inquiring about her absence. Booker telephoned Williams' apartment and "learned" she had been killed. Booker then went to her apartment, where he met Detectives Lewis and Owens. Owens contacted Kelly, who requested that Owens ask Booker if he voluntarily would accompany Owens and Lewis to the Area One headquarters to help with the investigation. Booker agreed, saying that he wanted to help in any way he could.

On the way to the station, they stopped for soft drinks and cigarettes. The three men arrived at the station between 11:30 a.m. and 11:45 a.m. When Booker asked why he was being held, Lewis and Owens told him that he was not being held, but asked him to wait for Ward and Kelly to arrive. Throughout the time he waited at the station and during the ride to the station, Booker was not handcuffed, restrained, or threatened with physical force. The officers allowed Booker to use the bathroom and the telephone in the lineup room while he waited, although an officer sat at the desk while he used the telephone. Neither Owens nor Lewis expressly told Booker that he could leave or refuse to answer questions. Before Ward and Kelly arrived at the station, Owens and another officer examined Booker's fingernails and shoes for blood. No one told Ward and Kelly of this examination.

While Booker waited at the station, Ward and Kelly continued their interviews. Elaine Sims, Williams' cousin, told them that Williams and Booker had lived together, but that Williams had asked Booker to move out three weeks before because she no longer wanted to live with or marry him. Sims also said that Williams recently had had an abortion, but told Booker she had miscarried. Sims did not say that Booker had discovered Williams' lie, but did tell the detectives that Booker was very jealous, drank heavily, and often would forget what he did while drinking. However, Sims did not say that Booker was violent or that he ever had threatened to harm Williams.

Ward and Kelly arrived at the station between 1:00 p.m. and 1:30 p.m. At around 2:00 p.m., they began interviewing Booker in the lineup room where he had been waiting. Before they asked any questions, Ward and Kelly read Booker a standard *Miranda* warnings form and Booker signed the form. Although they did not expressly tell Booker he could leave, the *Miranda* warnings advised him of his right to not answer questions. Booker told the detectives that he had tried to reach Williams by telephone at about 8:00 p.m. the previous evening, and that he had talked to her about an hour later. He did not mention having any other contact with Williams that night. Booker stated that he had been out drinking with friends throughout the evening, that he slept at his girlfriend's home, and that he did not leave her home until 7:40 a.m. that morning. He denied any knowledge of or participation in Williams' murder. During the interview, a record check indicated that Booker did not have a criminal record.

At the detectives' request, Booker agreed to provide fingerprints and to take a polygraph examination. The detectives did not tell Booker that he could leave or that he could refuse. Before administering the polygraph, the examiner read Booker his *Miranda* warnings and Booker signed a form acknowledging that his participation in the examination was voluntary. After the hour-long examination, the examiner told Ward and Kelly that he believed Booker was being untruthful and uncooperative, and that he was trying to beat the machine. With the detectives' approval, the examiner told Booker that he could not pass him on the test. Booker then admitted that he had lied, and that he had driven by Williams' apartment building twice during the previous night and

early morning. Ward and Kelly then told Booker he was under arrest. That evening, Booker confessed to beating Williams to death with a pipe. Booker's confession detailed why he pulled her pants down and covered her groin area with the car mat.

## ANALYSIS

### I. *Motion to Dismiss*

■ The district court dismissed Booker's unlawful arrest claims against Lewis and Owens because Booker had not sued them within the two-year statutory limitations period. The district court concluded that Booker's § 1983 claim for unlawful arrest in violation of the Fourth Amendment accrued at the time of his arrest on August 7, 1987. We review the district court's ruling *de novo*. *Reed v. City of Chicago*, 77 F.3d 1049, 1051 (7th Cir.1996).

#### a. *Heck v. Humphrey*

■ Booker claims that the defendants arrested him without probable cause on August 7, 1987. But he did not sue Lewis and Owens for unlawful arrest pursuant to 42 U.S.C. § 1983 until February 13, 1995. The statute of limitations for section 1983 claims arising in Illinois is two years. *See Farrell v. McDonough*, 966 F.2d 279, 282 (7th Cir. 1992), *cert. denied*, 506 U.S. 1084, 113 S.Ct. 1059, 122 L.Ed.2d 364 (1993). To determine when Booker's § 1983 claim against Lewis and Owens accrued, we look to a recent Supreme Court decision on which both sides rely for opposite conclusions, *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994).

In *Heck*, the § 1983 plaintiff sued county prosecutors and a state police investigator for committing unlawful acts to secure his state court conviction. The Court affirmed the dismissal of the plaintiff's action, holding that a plaintiff seeking damages for an allegedly unconstitutional conviction or imprisonment, or for other harms caused by unlawful actions that would render a conviction or sentence invalid, has no § 1983 cause of action until the conviction or sentence is reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus. *Id.*

at ——, ——, 114 S.Ct. at 2372, 2373. In other words, if a judgment in favor of the plaintiff "would *necessarily imply* the invalidity of his conviction or sentence," *id.*, at ——, 114 S.Ct. at 2372 (emphasis added), the lawsuit cannot go forward unless the plaintiff's conviction or sentence already has been invalidated. If, on the other hand, the "plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff," then the plaintiff does have a § 1983 cause of action. *Id.* (emphasis in original). *Heck* added that, because of doctrines such as independent source, inevitable discovery, and harmless error, claims seeking damages for unreasonable searches were the type that "would not *necessarily* imply that the plaintiff's conviction was unlawful." *Id.*, at —— n. 7, 114 S.Ct. at 2373 n. 7 (emphasis in original).

Booker contends that success on his unlawful arrest claim would necessarily imply the invalidity of his conviction, and that therefore under *Heck* he could not bring his § 1983 unlawful arrest claim until October 1994, when the trial court vacated his conviction. We disagree, because a wrongful arrest claim, like a number of other Fourth Amendment claims, does not inevitably undermine a conviction; one can have a successful wrongful arrest claim and still have a perfectly valid conviction. *See Simpson v. Rowan*, 73 F.3d 134, 136 (7th Cir.1995), *petition for cert. filed* (May 16, 1996) (No. 95–8993); *Perez v. Sifel*, 57 F.3d 503, 505 (7th Cir.1995). *See also Rooding v. Peters*, 92 F.3d 578 (7th Cir.1996). Although in this case the Illinois Appellate Court's conclusion that Booker's confession was the inadmissible product of an unlawful arrest ultimately resulted in the dismissal of murder charges against Booker, in many cases, the prosecutor will have other witnesses or other evidence that will support a retrial. As it happens, here the prosecutor did not have such other evidence to produce against Booker. But there is nothing necessary or inevitable about that result. Indeed, the Appellate Court's remand for an attenuation hearing shows that success on Booker's unlawful arrest claim would not necessarily undermine the validity of his conviction. We conclude that Booker's § 1983 unlawful ar-

rest claim against Owens and Lewis accrued on the day of his arrest, August 7, 1987. Because he did not bring his § 1983 claim against Owens and Lewis until February 1995, the two-year statute of limitations bars his suit.

b. *Equitable Tolling of Limitations Period*

■ Booker relies in the alternative on a ground the district court addressed *sua sponte*: that the statute of limitations was equitably tolled while the case was dismissed pending the conclusion of state court proceedings. The doctrine of equitable tolling provides that "a person is not required to sue within the statutory period if he cannot in the circumstances reasonably be expected to do so." *Heck v. Humphrey*, 997 F.2d 355, 357 (7th Cir.1993), *aff'd. on other grounds*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). But equitable tolling does not give a plaintiff "an automatic extension of indefinite duration, no matter how much his carelessness or sloth may have contributed to the delay in the prosecution of his claim." *Id.* Instead, it gives the plaintiff only the extra time that he needs, despite all due diligence on his part, to file his claim. *Id.*

The district court concluded that, even if the doctrine of equitable tolling otherwise would apply, Booker's lack of diligence in adding Owens and Lewis as defendants at an earlier stage of the proceedings precluded it. We agree. Booker's case was pending for eighteen months before the district court dismissed it with leave to reinstate, and Booker had numerous opportunities to name Owens and Lewis as defendants during that time. Their names were not hidden from Booker. In fact, Owens and Lewis testified at Booker's trial, and the Illinois Appellate Court's January 1991 decision in *Booker I* specifically mentioned them by name. Because Booker did not act diligently in naming Owens and Lewis as defendants before the district court dismissed the case with leave to reinstate, the doctrine of equitable tolling does not save him. *See Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 453 (7th Cir.1990), *cert. denied*, 501 U.S. 1261, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991).

II. *Summary Judgment*

■ The district court granted summary judgment for Ward and Kelly on Booker's unlawful arrest claim because it concluded that the detectives had probable cause to arrest Booker and that even if probable cause did not exist, the detectives were entitled to qualified immunity. We review the district court's summary judgment order *de novo*. *Sheik–Abdi v. McClellan*, 37 F.3d 1240, 1243 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 937, 130 L.Ed.2d 882 (1995).

■ As we noted above, the Illinois Appellate Court found that probable cause did not exist to arrest Booker for Williams' murder on August 7, 1987. Booker urges us to "adopt a strict rule that the finding by a state appellate court that an arrest was made without probable cause is enough evidence to defeat the arresting officer's motion for summary judgment on the same issue in a federal civil rights case." Indeed, Booker urges us to go further and hold that such a finding is *conclusive* on the probable cause issue. We decline to adopt either proposition because Ward and Kelly were not parties to the state court proceedings and did not have a full and fair opportunity to litigate the issue of whether they had probable cause to arrest Booker. *See Kraushaar v. Flanigan*, 45 F.3d 1040, 1050–51 (7th Cir.1995); *Williams v. Kobel*, 789 F.2d 463, 470 (7th Cir.1986).

■ To succeed on his unlawful arrest claim against Ward and Kelly, Booker must prove that they arrested him without probable cause. *Jones by Jones v. Webb*, 45 F.3d 178, 181 (7th Cir.1995). A law enforcement officer has probable cause to arrest when "the facts and circumstances within [his] knowledge and of which [he has] reasonably trustworthy information [are] sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense." *Id., quoting Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). We evaluate probable cause "not on the facts as an omniscient observer would perceive them but on the facts as they would have appeared to a reasonable person *in the position of the arresting officer*—seeing what

he saw, hearing what he heard." *Mahoney v. Kesery,* 976 F.2d 1054, 1057 (7th Cir.1992) (emphasis in original). Although the issue of probable cause in a damages suit like this one generally is a jury question, the court appropriately may conclude that probable cause existed as a matter of law "when there is no room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Sheik–Abdi,* 37 F.3d at 1247.

In deciding whether the district court properly resolved this issue on summary judgment, we consider only the information actually known to Ward and Kelly when they arrested Booker after he admitted lying to them about his activities the night of Williams' murder. At that time, Kelly and Ward had seen the physical evidence at the crime scene, including evidence of "overkill" and that the attack was planned, which suggested that Williams' killer knew her and was filled with rage against her. They had learned from Williams' cousin Elaine Sims about Booker's and Williams' failed relationship and that Williams had lied to Booker about her miscarriage. Sims also told them that Booker was jealous, drank heavily, and often forgot what he did while drinking. Booker himself told the detectives that he had been drinking with friends the previous evening. Ward and Kelly knew that Booker had not passed the polygraph examination. *See Bennett v. City of Grand Prairie, Texas,* 883 F.2d 400, 405–06 (5th Cir.1989) (results of polygraph examination can be considered in probable cause determination). *See also Prokey v. Watkins,* 942 F.2d 67, 73 (1st Cir.1991); *Marx v. Gumbinner,* 905 F.2d 1503, 1507 (11th Cir.1990). Ward and Kelly also knew that Booker had lied to them about being in the vicinity of Williams' apartment building during the night and early morning hours. This lie, taken with the other information known to Ward and Kelly, established probable cause to arrest Booker, not only because lying about an incriminating fact can indicate guilt, *see United States v. Leung,* 929 F.2d 1204, 1208 (7th Cir.), *cert. denied,* 502 U.S. 906, 112 S.Ct. 297, 116 L.Ed.2d 241 (1991), but because Booker's subsequent admission placed him near the crime scene at around the time Williams likely was killed.

Booker contends that he was arrested earlier in the day, when Ward and Kelly first gave him *Miranda* warnings and before he took the polygraph examination, and that probable cause did not exist to arrest him at that time. But Ward and Kelly did nothing to restrain Booker; they only interviewed him and asked him to take a polygraph examination. Booker voluntarily agreed to both the interview and the polygraph because he "wanted to help in any way he could." In these circumstances, Booker was not seized within the meaning of the Fourth Amendment. *See United States v. Burns,* 37 F.3d 276, 279 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2592, 132 L.Ed.2d 840 (1995). Though Booker focuses on the fact that the detectives and the polygraph examiner gave him *Miranda* warnings, the mere giving of such warnings even when not required does not transform noncustodial questioning into nonconsensual custodial interrogation. *Sprosty v. Buchler,* 79 F.3d 635, 642 (7th Cir.1996), *petition for cert. filed* (June 21, 1996) (No. 95–9393).

In short, Ward and Kelly had physical evidence indicating that Williams' killer knew her and killed her in a rage, that Williams falsely had told Booker that she had had a miscarriage, and that Booker had lied about his whereabouts at the time Williams was killed. These facts were sufficient for a prudent person to believe that Booker had committed the murder. *See Jones,* 45 F.3d at 181. We conclude that the district court properly granted the detectives' summary judgment motion. We therefore need not address whether Ward and Kelly were entitled to qualified immunity for their actions.

## CONCLUSION

For the foregoing reasons, we affirm the district court's orders granting Owens' and Lewis' motion to dismiss, and Kelly's and Ward's motion for summary judgment.

AFFIRMED.