*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-CV-841

RONALD JENKINS, *et al.*, APPELLANTS,

V.

DISTRICT OF COLUMBIA, *et al.*, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAB-5282-14)

(Hon. Thomas J. Motley, Trial Judge)

(Argued February 28, 2018                    Decided January 30, 2020)

*Gregory L. Lattimer* for appellants.

*Mary L. Wilson*, Senior Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General at the time the brief was filed, and *Loren L. AliKhan*, Deputy Solicitor General at the time the brief was filed, were on the brief, for appellees.

Before FISHER and THOMPSON, *Associate Judges*, and FERREN, *Senior Judge*.

THOMPSON, *Associate Judge*:   Plaintiffs/appellants Ronald and Sharon Jenkins appeal from an order of the Superior Court entering summary judgment in favor of defendants/appellees, the District of Columbia (the "District") and Michael Davis, on plaintiffs' claims brought under 42 U.S.C. § 1983, their

common-law claims of assault and battery, and Mr. Jenkins's common-law claims of false arrest and negligent supervision. We affirm.

## I. Background

The following facts are not in dispute. On the afternoon of September 2, 2013, the Jenkinses went to buy crabs at the Wharf, where Mr. Jenkins, who had been driving the Jenkinses' vehicle, got into a verbal altercation with another driver ("the complainant") in the parking lot. According to the Jenkinses, just before the altercation, the other driver had "stolen" the parking space for which Mr. Jenkins had been waiting. After the altercation, the Jenkinses, having found another parking space, went to make their purchases. Before they returned to their vehicle, a police radio run went out reporting "a traffic dispute that possibly resulted in some type of assault" in which "a knife had been pulled." In response to the radio run, Metropolitan Police Department (MPD) Officer Michael Davis responded to the scene, where he spoke with other officers who were already present and, together with the other officers, began interviewing witnesses.

At the scene, the police officers spoke with a number of individuals about what had occurred. The complainant's nephew, a minor child with the initials

"S.M.," told officers that Mr. Jenkins had argued with the complainant while armed with a small, folding pocketknife that had a serrated blade.[1] The complainant initially informed a detective that Mr. Jenkins was holding a set of keys in his hand and that he (the complainant) never saw a knife, but, an hour later, through an interpreter, the complainant told police that Mr. Jenkins had "angrily approached him . . . [and] produced what appeared to be a small pocket knife . . . ." An unidentified person told the police that he or she saw the complainant and Mr. Jenkins arguing but did not see Mr. Jenkins with a weapon.[2] (Officer Davis stated later, in his deposition, that a woman who was passing by told him that she saw Mr. Jenkins "pull a knife" on the complainant, but this was not mentioned in the officer's written report about the incident.)

While the police were still on the scene, appellants returned to their car, put their purchases in the trunk of their vehicle, and were about to drive off, when two MPD officers stopped them and asked Mr. Jenkins whether he had a knife and

---

[1] S.M. testified in his deposition that the woman who was with Mr. Jenkins — i.e., Mrs. Jenkins — also "got out [of the car]," "wrote [the complainant's] plate number down[,]" and "said watch what's going to happen because . . . she had her cousin or somebody that was a cop."

[2] The vantage point and timing of the passerby are not disclosed in the record.

whether he had pulled a knife on the complainant. Mr. Jenkins denied having done so and denied having a knife. Mrs. Jenkins corroborated his account, telling the police that her husband "merely mentioned to the complainant that he was waiting next in line for the parking space that the complainant took" and then "walked within eyesight of the complainant to one of the fisherman boats and purchased crabs." The officer told Mr. Jenkins to "stay right there for a minute" while the officer went back to speak with the complainant. When the officer returned, he asked Mr. Jenkins to step out of the car, which he did. Mr. Jenkins then opened the trunk of the car to allow the police to search for a knife. The officers also searched the rest of the vehicle. Mrs. Jenkins stepped out of the vehicle during the vehicle search, and the police looked through her purse as well. Officers also searched in nearby trash cans and under cars in the immediate area, but found no knife. Officer Davis approached Mr. Jenkins and arrested him for assault with a dangerous weapon (ADW) before searching his person and taking all of his personal items out of his pocket.

At some point, an unnamed female police officer approached Mrs. Jenkins and told her to get out of the car because "she was going to search [her]."[3]

---

[3] The record is unclear as to the precise sequence of events — e.g., as to whether the patdown search of Mrs. Jenkins took place before or after Mr. Jenkins

(continued…)

Mrs. Jenkins walked with the female officer to the police van, where she stood spread-eagle while the female officer patted her down over her clothing and checked her hair (which she was wearing in a braided hairstyle) for a weapon.[4]

The police officers did not find a knife in the Jenkinses' car or on the person of either Mr. Jenkins or Mrs. Jenkins. Mr. Jenkins was transported to the First District Station for booking and spent the night in jail. At an initial appearance the next day, the government declined to prosecute Mr. Jenkins, and he was released from custody.

After the Jenkinses filed their lawsuit, the District of Columbia and Officer Davis moved for summary judgment on all of the Jenkinses' claims. Reviewing the undisputed facts (and disregarding Officer Davis's deposition testimony about an unnamed woman who claimed to have seen Mr. Jenkins with a knife), the

---

(…continued)

was arrested, and whether the patdown search of Mrs. Jenkins and the arrest of Mr. Jenkins took place before or after officers searched for a knife in trashcans and under cars. The precise sequence is not material for purposes of our analysis.

[4] Mrs. Jenkins testified that the female officer "went inside of my legs. She went outside of my legs. She went down my arms. I think she like checked my collar. . . . She checked my hair. . . . [T]hen she went under my bra, my bra line. . . [S]he went along the sides [of my torso]. . . . She went along my arms. Went in between my legs and down the side. I didn't have on a belt and she checked the back."

Superior Court concluded that "sufficient evidence existed for Officer Davis to make a determination of probable cause to arrest Mr. Jenkins for [ADW]." The court granted summary judgment in favor of the District and Officer Davis on all of Mr. Jenkins's claims (making no distinction between the § 1983 and common-law claims).

Addressing Mrs. Jenkins's claims, the Superior Court reasoned that "the combination of proximity and marriage [was] an insufficient basis" for probable cause to search Mrs. Jenkins as "an aider and abettor of Mr. Jenkins'[s] alleged criminal conduct" or as an accessory after the fact. The court also reasoned that while the facts known to the officers supported a reasonable suspicion that Mrs. Jenkins might be in possession of the knife, the facts were insufficient to support a reasonable belief that Mrs. Jenkins was both armed *and* dangerous. Concluding, however, that there was no clearly established law regarding whether an officer may search "the accompanying passenger after a search of the arrestee driver and the vehicle itself proved fruitless" and that "the right of an individual not to be searched under the circumstances of the instant case is not clear," the court determined that "a clearly known right was not violated when a search was performed on Mrs. Jenkins" and that "qualified immunity applies." The court

therefore granted summary judgment in favor of the defendants on Mrs. Jenkins's claims.

## II.  Discussion

### A.  Mr. Jenkins's claims

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Super. Ct. Civ. R. 56(a).  Our review of an order granting summary judgment is *de novo*[.]"  *Perkins v. District of Columbia*, 146 A.3d 80, 84 (D.C. 2016).

Mr. Jenkins asserts that the trial court erred in granting summary judgment because there were "no undisputed facts indicating that Mr. Jenkins had a knife" on the date of the alleged offense and "an abundance of evidence indicating that [he] did not."  As to the first of these points, the short answer is that the issue in this case is not whether Mr. Jenkins actually committed the offense of ADW or possessed a pocketknife on the date in question.  "[T]he relevant inquiry in a false arrest defense is not what the actual facts may be but rather what the officers could

reasonably conclude from what they were told and what they saw on the scene." *Enders v. District of Columbia*, 4 A.3d 457, 470-71 (D.C. 2010); *see also Wright v. City of Philadelphia*, 409 F.3d 595, 602 (3d Cir. 2005) ("[T]he constitutional validity of the arrest does not depend on whether the suspect actually committed any crime."). The issue in this case is whether, at the time of Mr. Jenkins's arrest and based on the facts (undisputedly) known to Officer Davis and the other officers at the scene, there was probable cause to believe that Mr. Jenkins had committed a criminal offense (specifically, ADW). *See Bradshaw v. District of Columbia*, 43 A.3d 318, 323 (D.C. 2012) ("A police officer may justify an arrest [and defeat a wrongful arrest claim brought under §1983 and a common-law false arrest claim] by showing that he or she had probable cause, in the constitutional sense, to make the arrest.").

"Probable cause to arrest exists where the facts and circumstances within the police officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man or woman of reasonable caution in the belief that an offense has been or is being committed." *Butler v. United States*, 102 A.3d 736, 739 (D.C. 2014) (internal quotation marks omitted); *see also District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (explaining that probable cause "requires only a probability or substantial chance of criminal

activity, not an actual showing of such activity" (internal quotation marks omitted)); *Kaley v. United States*, 571 U.S. 320, 338 (2014) (Probable cause "requires only the kind of fair probability on which reasonable and prudent people . . . act.") (brackets and internal quotation marks omitted).  "When facts support a 'fair probability' that a suspect has committed a crime, probable cause to arrest exists."  *Bridewell v. Eberle*, 730 F.3d 672, 675 (7th Cir. 2013) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)); *see also Crowe v. County of San Diego*, 593 F.3d 841, 867 (9th Cir. 2010) ("In determining whether there was probable cause to arrest, we look to the totality of circumstances known to the arresting officers, to determine if a prudent person would have concluded there was a fair probability that the defendant had committed a crime.") (brackets and internal quotation marks omitted); *United States v. Denson*, 775 F.3d 1214, 1217 (10th Cir. 2014) ("Probable cause doesn't require proof that something is more likely true than false.  It requires only a fair probability, a standard understood to mean something more than a bare suspicion but less than a preponderance of the evidence at hand.") (internal quotation marks omitted).

As to Mr. Jenkins's point about the "abundance of evidence indicating that [he] did not" display a knife during the encounter with the complainant, the short answer is that probable cause may exist even when there are "statements and

circumstantial indicators on both sides of the issue . . . ." *Pendergrast v. United States*, 416 F.2d 776, 783 (D.C. Cir. 1969); *see also id.* at 783–84 (concluding that the circumstances preceding arrest "amply possessed th[e] capability" of "warrant[ing] a man of reasonable caution in the belief of [the suspect's] guilt" despite the facts that the complainant who identified the suspect-stranger as one of his assailants "had recently been drinking," and that the suspect gave an innocent explanation for his presence on the street and "promptly denied complicity" when confronted with the complainant's accusation) (internal quotation marks and footnote omitted). For probable cause to exist, "[t]he indicia of guilt need not be absolute, or even fully consistent; they may leave some room for doubt, and even for error." *Id.* at 784 (footnotes omitted). "[T]he [probable cause] standard does not require that officers correctly resolve conflicting evidence or that their determinations of credibility, were, in retrospect, accurate." *Wright*, 409 F.3d at 603. As one district court has observed, "[t]he inference of the suspect's guilt need not be the most likely scenario, or even more likely true than not, for a reasonable officer to have probable cause to arrest." *Hyung Seok Koh v. Graf*, 307 F. Supp. 3d 827, 848 (N.D. Ill. 2018) (citing *Kaley* and *Wesby*).

The overarching issue before us is whether Mr. Jenkins was entitled to have a jury decide whether there was probable cause for his arrest. It is clear under our

case law that "where the facts that might establish probable cause are in dispute, their existence is for the determination of the jury." *May Dep't Stores Co. v. Devercelli*, 314 A.2d 767, 771 (D.C. 1973). Here, the material facts, recited above are not in dispute; that is, there were no factual issues that precluded summary judgment. This court has said, however, in a number of cases, that "[t]he issue of probable cause in a [wrongful] arrest case is a mixed question of law and fact that the trial court should ordinarily leave to the jury." *Bradshaw*, 43 A.3d at 324; *Enders*, 4 A.3d at 469; *District of Columbia v. Murphy*, 631 A.2d 34, 37 (D.C. 1993); *see also, e.g.*, *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 468 (3d Cir. 2016) ("[I]t will usually be appropriate for a jury to determine whether probable cause existed."); *Booker v. Ward*, 94 F.3d 1052, 1058 (7th Cir. 1996) ("[T]he issue of probable cause in a damages suit . . . generally is a jury question[.]"). But we have also explained that "where the facts are undisputed or clearly established . . . probable cause becomes a question of law for the court." *Enders*, 4 A.3d at 469; *Smith v. Tucker*, 304 A.2d 303, 306 (D.C. 1973) (explaining that "[w]here the facts are in dispute, the existence of the facts [is] for the jury, but their effect, when found is a question for the determination of the court") (internal quotation marks omitted); *Prieto v. May Dep't Stores Co.*, 216 A.2d 577, 578 (D.C. 1966) (false arrest case stating that "[w]here the facts are not in dispute the question of probable cause is one of law to be decided by the court."); *see Stewart*

*v. Sonneborn*, 98 U.S. 187, 194 (1878) ("Whether the circumstances alleged to show [probable cause] are true, and existed, is a matter of fact; but whether, supposing them to be true, they amount to a probable cause, is a question of law.").

In answering that question of law, we apply the standard that judgment as a matter of law is appropriate in a wrongful arrest case if the evidence relevant to probable cause is "so clear that reasonable men could reach but one conclusion." *Bradshaw*, 43 A.3d at 324 (internal quotation marks omitted); *Enders*, 4 A.3d at 469 (internal quotation marks omitted); *accord Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003) ("The existence of probable cause is a jury question, unless there is only one reasonable determination that is possible."); *Booker*, 94 F.3d at 1058 ("[T]he court appropriately may conclude that probable cause existed as a matter of law 'when there is no room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them.'") (quoting *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1246 (7th Cir. 1994))[5]; *DeLoach v. Bevers*, 922

---

[5] In *Booker*, the Seventh Circuit affirmed a grant of summary judgment in favor of defendant police officers in a § 1983 unlawful arrest case, concluding that the defendant officers had probable cause to arrest Booker for murder even though, in the related criminal proceeding, the Illinois state appellate court had found no probable cause to arrest Booker and reversed his conviction. *See* 94 F.3d at 1054, 1058.

In *Sheik-Abdi*, the Seventh Circuit affirmed a grant of summary judgment in favor of police officers in an unlawful arrest suit, concluding that where police

(continued…)

F.2d 618, 623 (10th Cir. 1990) (citing authority that "where the issue [of probable cause] arises in a damage suit, it is . . . a proper issue for the jury if there is room for a difference of opinion").

This is a case in which there may have been more than one reasonable inference available to the police officers about what actually occurred in the Wharf parking lot. We conclude, however, on the summary judgment record before us that this is a case in which there is no room for a difference of opinion — and a reasonable jury could reach but one conclusion — regarding probable cause: to wit, that a prudent officer would have believed that there was at least a fair probability that Mr. Jenkins committed the crime alleged, and therefore that Officer Davis had probable cause to arrest Mr. Jenkins. In reaching this

---

(…continued)

arrested Sheik-Abdi after a witness told them he saw Sheik-Abdi strike his wife, "[t]he officers' decision to arrest Sheik-Abdi for battery easily [fell] within the zone of probable cause" even though his wife "denied that the striking had occurred" and "bore no contemporary markings of bodily harm[.]" 37 F.3d at 1246–48. By contrast, in *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993), the Seventh Circuit reversed a grant of summary judgment for the defendants, explaining that there was "a substantial question as to whether a prudent police officer would have probable cause to believe that [plaintiff] Maxwell [who was six inches taller and almost 100 pounds heavier than indicated in the description of fugitive Moore in an *America's Most Wanted* notice and was missing the tip of his left middle finger rather than, as indicated in the notice, the tip of the left index finger] was Moore."

conclusion, we are instructed by the Supreme Court's opinion in *Wesby*, which concretely demonstrates that "[p]robable cause is not a high bar," 138 S. Ct. at 586 (internal quotation marks omitted); that police are entitled to draw reasonable inferences (which need not be the only possible inferences) when presented with conflicting evidence, *id.* at 588; and that a suspect's "innocent explanations . . . do not have any automatic probable-cause-vitiating effect[,]" *id.* at 592.

The facts of *Wesby* are that police officers responded to neighbors' complaints about loud music and illegal activity in a house that had been vacant for several months and found in the house a group of late-night partygoers. *Id.* at 583. The officers smelled marijuana and saw beer bottles and cups of liquor on the floor, and there was a "makeshift strip club" operating in the living room and "debauchery" happening on a bare mattress that was on the floor of an upstairs bedroom. *Id.* at 583. Each of the partygoers told police that someone had invited them to the house (for a bachelor's party, some said), and, at the officers' request, one of the partygoers made a phone call to "Peaches," the putative host, who, the partygoer said, had just started renting the house. *Id.* Peaches told the officers that she was renting the house from the owner and that she had given the attendees permission to have a party there. *Id.* Upon contacting the owner, police learned that the putative host had not finalized a rental agreement for the home and

therefore lacked the right to use the house or authorize the party, and Peaches eventually admitted the same to the officers when they telephoned her again. *Id.* at 583–84. The officers arrested the partygoers for unlawful entry. *Id.* at 584. The charges eventually were dropped, and the partygoers sued for wrongful arrest under §1983 and District law. Ruling on cross-motions for summary judgment, a divided panel of the United States Court of Appeals for the D.C. Circuit affirmed a grant of summary judgment in favor of the partygoers on the issue of liability, reasoning that "[a]ll of the information that the police had gathered by the time of the arrest made clear that [p]laintiffs had every reason to think that [the plaintiff partygoers] had entered the house with the express consent of someone they believed to be the lawful occupant." *Wesby v. District of Columbia*, 765 F.3d 13, 21 (D.C. Cir. 2014), *rev'd*, 138 S. Ct. 577 (2018) (footnote omitted). The D.C. Circuit majority concluded that "there was no probable cause for the officers to believe that the [p]laintiffs entered the house knowing that they did so against the will of the owner or occupant." *Id.*

The Supreme Court reversed, reasoning that "the officers made 'an entirely reasonable inference' that the partygoers [knew their party was not authorized and] were knowingly taking advantage of a vacant house as a venue for their late-night party"; that "the officers could have reasonably inferred that [in stating otherwise,

the partygoers] were lying" and that Peaches was lying when she said she had invited them to the house; and that the officers could even have "inferred that [the putative host] "told the partygoers . . . that she was not actually renting the house[.]" *Wesby*, 138 S. Ct. at 586–87, 588 (internal quotation marks omitted). A reasonable officer could draw these inferences even though the house had some "signs of inhabitance—working electricity and plumbing, blinds on the windows, toiletries in the bathroom, and food in the refrigerator[,]" *id.* at 586, and even though the condition of the house was arguably consistent with the putative host's being a new tenant, *id.* at 588. The Court held that "[v]iewing the[] circumstances as a whole, a reasonable officer could conclude that there was probable cause to believe the partygoers knew they did not have permission to be in the house." *Id.* at 588.[6] To have probable cause, the Court cautioned, the officers did not have to "rule out [the partygoers'] innocent explanation" for their presence in the house.[7]

---

[6] The Court recited a number of "suspicious facts": partygoers scattered or hid when they saw the uniformed officers; the floor was dirty; the house had no furniture other than a few metal chairs and a bare mattress; there were no clothes in closets or boxes or other moving supplies; and Peaches had lied about renting the house and seemed evasive. *Id.* at 583, 586, 587, 588.

[7] As the Supreme Court observed, the D.C. Circuit majority thought that the lap dances and drinking observed by the officers found when they entered the house were "'consistent with' the partygoers' explanation that they were having a bachelor party" and "dismissed the condition of the house as 'entirely consistent with' Peaches being a new tenant." 138 S. Ct. at 588 (quoting 765 F.3d at 23). But the Supreme Court was more impressed with the fact that none of the

(continued…)

*Id.* And, notably, the Supreme Court did not simply conclude that the plaintiff partygoers' wrongful arrest claim should go to a jury; rather, notwithstanding the record facts that weighed on both sides of the probable-cause issue and that split the D.C. Circuit panel, the Court concluded that the District of Columbia and its officers were entitled to summary judgment on all of the plaintiffs' wrongful arrest claims. *See* 138 S. Ct. at 589. The Court stated that its analysis "would not change no matter which party is considered the moving party" (i.e., even viewing the evidence in the light most favorable to the partygoers). *Id.* at 584 n.1.

In the instant case, the police responded to a radio run reporting that "a knife had been pulled" following a traffic dispute at the Wharf. The police thereafter spoke to the complainant and his nephew S.M., who both reported that Mr. Jenkins had angrily confronted the complainant while holding in his hand a pocketknife with the serrated blade visible. Mr. Jenkins acknowledged that he had confronted the complainant to complain about the latter's taking of the parking space, thus partially corroborating the complainant's and S.M.'s account. Mr. Jenkins denied that he had a knife, and no knife was found, but the officers knew that the

---

(…continued)
partygoers "could identify the bachelor[,]" a fact from which the officers could reasonably infer that the partygoers were lying. *Id.* at 587.

Jenkinses had walked away from the parking lot after the incident and thus would have had an opportunity to hide or dispose of the knife (if Mr. Jenkins had one) had they noticed the police presence (which, it appears, would have been "within [their] eyesight" **[JA 147]**) before or during their walk back to the parking lot.

On the foregoing undisputed facts and the summary judgment record as a whole, and given the "not . . . high" bar that the probable-cause standard presents, we are satisfied that any reasonable juror would have to conclude that the police had evidence from which they could reasonably believe that there was a fair probability (even if not a preponderant likelihood) that Mr. Jenkins displayed a knife during the encounter with complainant, and that no reasonable jury could conclude that the officers lacked probable cause to arrest Mr. Jenkins for ADW. *Wesby*, 138 S. Ct. at 586. In the wake of *Wesby*, we conclude that even if the facts here present "a very close call" as to what actually occurred during the encounter, probable cause is "too low a bar[,]" *Hyung Seok Koh*, 307 F. Supp. 3d at 848, for Mr. Jenkins to succeed on his wrongful arrest claim.

"Probable cause to arrest exists if a police officer either had firsthand knowledge or received his information [about an offense having been committed] from some person — normally the putative victim or an eyewitness — who it

seems reasonable to believe is telling the truth." *Davis v. United States*, 759 A.2d 665, 670 (D.C. 2000) (internal quotation marks omitted). Here, the summary judgment record contains no deposition testimony about S.M.'s demeanor or manner of dealing with the officers from which a jury could conclude that the officers could not reasonably believe that his account (which, according to the police report, "remained consistent") was truthful.[8] And, as a matter of law,

---

[8] *Cf. Smith*, 304 A.2d at 306–7 (explaining, in malicious prosecution action, that in the absence of evidence raising an issue about the honesty of the complainant's belief that plaintiff was the intruder she saw leaving her tavern, "there was no fact issue respecting probable cause for the jury to resolve."). The instant case, which involved a prompt report to police and the absence of any video evidence, is quite different from *Sherrod v. McHugh*, 334 F. Supp. 3d 219 (D.D.C. 2018), in which the court summarized the facts that "[f]rom the very beginning" should have caused the police detective to "view[] skeptically" the claim that plaintiff Mrs. Sherrod had threatened the complainant with a gun after a traffic incident, and that enabled the plaintiff's wrongful arrest claim to survive summary judgment: the complainant "waited several hours before reporting the alleged incident" to police; Mrs. Sherrod was an elderly woman ("pushing 80 years old") who "did not fit the profile of the typical perpetrator of an assault with a deadly weapon"; before arresting Mrs. Sherrod, the detective did not interview a witness who was shown on a security video that the parties agreed captured the altercation; and the security video was so pixelated that a jury was "the proper mechanism by which th[e] question [of whether it showed Mrs. Sherrod pointing a gun] should be resolved. *Id.* at 232, 233, 238, 240, 241.

Mr. Jenkins makes much of the fact that during his deposition (and in response to leading questions), S.M. agreed to a description of the knife different from the one he gave police officers on the scene. Specifically, during his deposition, S.M. agreed with appellants' counsel that the knife he allegedly saw was "purple" "with designs," while one of the detectives on the scene testified that she had been told that S.M. described the knife as "black." However, that apparent

(continued…)

although Mr. Jenkins appears to imply that S.M. was not credible simply because of his youth, the fact that S.M. was only ten years old did not foreclose a reasonable belief that he was telling the truth about seeing Mr. Jenkins with a knife.[9] We note further that Mr. Jenkins stated in his deposition that he did not overhear any of the conversation between the officers and S.M., and the record does not call into question the testimony by Officer Ronny Arce, who "assisted with talking with" S.M. in Spanish, that he "satisfied [him]self that, wherever [SM.] was [at the time of the incident], he was able to see [the knife]."[10]

---

(…continued)
inconsistency was not known to the police officers at the time of Mr. Jenkins's arrest.

[9] *See, e.g.*, *Gerald M. v. Conneely*, 858 F.2d 378, 381 (7th Cir. 1988) (rejecting claim that police lacked probable cause to detain two juveniles whom a ten-year-old had accused of stealing his bicycle; reasoning that the complainant's young age and the animosity between the children's families, without more, did not allow a reasonable inference that the ten-year-old's story was not worthy of belief); *People v. Hetrick*, 604 N.E.2d 732 (N.Y. 1992) (probable cause for a search of defendant's apartment was properly based on affidavit of nine-year-old child who claimed to have witnessed drug activity there); *see also Scott v. United States*, 953 A.2d 1082, 1093 (D.C. 2008) (upholding trial court's finding that six-year-old was competent to testify in criminal proceeding).

[10] And, of course, the possibility that Mr. Jenkins might be able to elicit testimony at trial that could cause a jury to question the reasonableness of the officers' reliance on the statements from the complainant and S.M. was not enough to stave off summary judgment. "[S]peculation and surmise, even when coupled with effervescent optimism that something definite will materialize further down the line, are impuissant in the face of a properly documented summary judgment motion." *Roche v. John Hancock Mutual Life Ins. Co.*, 81 F.3d 249, 253 (1st Cir.

(continued…)

As with S.M., the summary judgment record contains no deposition testimony from the officer who initially interviewed the complainant about the complainant's demeanor or other factors that would enable a jury to conclude that it was unreasonable for police to believe that the complainant was truthful in his later statement (made with the assistance of a translator) about Mr. Jenkins's display of a knife. The complainant's claim that Mr. Jenkins held a knife during the altercation was corroborated by S.M.'s statement and partially corroborated by Mr. Jenkins's acknowledgment of the angry encounter. Police could reasonably infer that the complainant's initial statement that he saw Mr. Jenkins with keys and not a knife was attributable to the complainant's limited English proficiency, and, in assessing the complainant's credibility, could reasonably take into account the fact, mentioned in the police report, that the complainant "doesn't speak fluent English[]" (and wasn't sure what Mr. Jenkins was saying to him during the encounter).[11] **[JA 147]** Further, the fact that the complainant changed his account

---

(…continued)

1996). "The function of summary judgment is to . . . assay the parties' proof in order to determine whether trial is actually required." *Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 94 (1st Cir. 1996) (internal quotation marks omitted).

[11] *Cf. Balasubramanrim v. Immigration and Naturalization Service*, 143 F.3d 157, 163–64 (3d Cir. 1998) (rejecting Board of Immigration Appeals's

(continued…)

did not preclude a reasonable belief that the complainant was telling the truth during his later interview (that was conducted with the aid of a translator).[12]

Finally, the officers could reasonably infer that Mr. Jenkins disposed of the knife after he noticed the police presence in the Wharf parking lot.[13]  To be sure,

---

(…continued)
adverse credibility determination regarding asylum seeker's claim that he was detained and tortured in his country because Board unreasonably failed to take into account that inconsistencies in his account, including his statement that he had never been arrested in his country, likely stemmed from his limited English proficiency; noting the asylum seeker's explanation that "[w]hatever [airport interview questions] I didn't understand, I said no.").

[12] *See, e.g.*, *Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir. 1997) (rejecting argument that police lacked probable cause to arrest the assault victim's husband, reasoning that even if police sergeant heard victim's initial claim that a different man had attacked her, it was reasonable for the sergeant "to assess [the victim's] demeanor, find her story credible, and rely on her subsequent identification of her husband as the attacker."); *Torchinsky v. Siwinski*, 942 F.2d 257, 263 (4th Cir. 1991) (concluding that detective acted reasonably in relying on victim's identification of the Torchinskys as his assailants even though the victim had previously "offered differing statements about the cause of his injuries").

[13] This case is readily distinguishable from *Payne v. Maher*, No. 11 C 6623, 2014 U.S. Dist. LEXIS 19617 (N.D. Ill. Feb. 18, 2014).  There, complainants Denton and Henderson called 911 to report that after Payne brandished a pocket knife, they disarmed him and threw him to the ground. *Id.* at *2-3.  All three men were still at the scene when police arrived, and Payne was lying on the ground, semi-conscious. *Id.* at *2, 7.  The district court, ruling in the suit for false arrest brought by Payne (who claimed that Denton and Henderson had accosted *him*), reasoned that with Payne injured, semi-conscious, on the ground and calling for an ambulance when police arrived, "the knife, if there actually was one, should have been there too." *Id*. at *7.  But no knife was found, "a state of affairs that [the

(continued…)

Mr. Jenkins consistently denied that he displayed or had a knife, but the officers were not required to believe him.[14]   Mr. Jenkins emphasizes the undisputed fact that the officers never found a knife in the "immediate area" they searched, but that fact also did not negate probable cause.   Per *Wesby*, we may not look at the absence of a knife in isolation, but must consider the totality of the circumstances

---

(…continued)

court reasoned] refuted [Denton's and Henderson's] claim that [Payne] had brandished a knife, [such that] a reasonable officer could not have reasonably believed, without more, that there was probable cause to arrest or charge Payne." *Id.* at \*11.  In the instant case, by contrast, police arrived after Mr. Jenkins had walked away from the parking lot where witnesses claimed he had displayed a knife and, unlike Denton and Henderson, Mr. Jenkins had not only an opportunity but also an incentive to dispose of any knife before police officers interviewed him.

[14]   *See, e.g.*, *Nichols v. Woodward & Lothrop, Inc.*, 322 A.2d 283, 286 (1974) (holding that an officer was not "obliged to believe the explanation of a suspected shoplifter."); *Borgman v. Kedley*, 646 F.3d 518, 524 (8th Cir. 2011) ("[An officer] need not rely on an explanation given by the suspect."); *Cox* v. *Hainey*, 391 F.3d 25, 32, n.2 (1st Cir. 2004) ("A reasonable police officer is not required to credit a suspect's story."); *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) ("[T]he arresting officer does not have to prove plaintiff's version wrong before arresting him[]" "is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest[,]" and "need not also believe with certainty that the arrestee will be successfully prosecuted."); *Marx* v. *Gumbinner*, 905 F.2d 1503, 1507, n.6 (11th Cir. 1990) ("[Officers a]re not required to forego arresting [a suspect] based on initially discovered facts showing probable cause simply because [the suspect] offered a different explanation."); *Criss* v. *Kent*, 867 F.2d 259, 263 (6th Cir. 1988) ("A policeman . . . is under no obligation to give any credence to a suspect's story . . . .").

of which the police officers were aware at the time Officer Davis arrested Mr. Jenkins. *See* 138 S. Ct. at 588.

Mr. Jenkins argues that there was no probable cause to arrest him for ADW because there was "no allegation . . . that [he] threatened [the] complainant with the knife or that the complainant felt threatened by the knife or that Jenkins acted in any way in a threatening manner with the knife." He also contends that a pocket knife was not a "dangerous weapon" as that term is used in the ADW statute because it was not a per se "prohibited weapon" as defined in D.C. Code § 22-4514(b) (2012 Repl.), which proscribes the possession of a "knife with a blade longer than 3 inches, or other dangerous weapon" "with intent to use [the weapon] unlawfully against another." D.C. Code § 22-4514(b) (2012 Repl.). However, ADW occurs when a person commits simple assault with a dangerous weapon, *see Perry v. United States*, 36 A.3d 799, 811 (D.C. 2011), and one species of simple assault is intent-to-frighten-assault, *see Contreras v. United States*, 121 A.3d 1271, 1274 (D.C. 2015). Intent-to-frighten-assault "requires proof that the defendant intended either to cause injury or to create apprehension in the victim by engaging in some threatening conduct . . . ." *Parks v. United States*, 627 A.2d 1, 5 (D.C. 1993). "[F]actual proof that the victim actually experience[d] apprehension or fear" is not "one of the essential elements" of the offense; rather, "the crucial

inquiry is whether the assailant acted in such a manner as would under the circumstances portend an immediate threat of danger to a person of reasonable sensibility." *Id.* at 5–6 (brackets omitted). Further, simply holding a weapon before another person in a threatening manner can constitute intent-to-frighten assault; it is not necessary for the defendant to "brandish" the weapon or ostentatiously threaten the victim with it. *See, e.g.*, *Parks*, 627 A.2d at 6–7 (holding that Parks's "act of starting his car, reaching for his pistol, and bringing it up [to his knee] . . . with his gaze fixed on" a police officer who had pulled him over constituted intent-to-frighten assault); *Mihas v. United States*, 618 A.2d 197, 199–200 (D.C. 1992) (upholding a conviction for intent-to-frighten assault where the evidence showed that Mihas, who claimed to have been using a paring knife to clean his nails immediately before the assault, came within four or five feet of the victim holding the paring knife with the blade pointing towards the ground at a forty-five-degree angle while speaking "words of commanding tone").

Here, Mr. Jenkins was alleged to have "pulled" a folding pocketknife on the complainant while arguing with him "angrily" in the parking lot and to have held the knife in his hand, blade out, during the confrontation, such that the knife was visible. We have little trouble concluding that a person of reasonable sensibility witnessing that alleged conduct would perceive an immediate threat of danger.

Moreover, it is immaterial that the length of the blade of the (putative) knife may have been under three inches. A "dangerous weapon is one which is likely to produce death or great bodily injury by the use made of it." *In re M.L.*, 24 A.3d 63, 68 (D.C. 2011). Even a pocketknife with a short blade can be a dangerous weapon under some circumstances. *See M.L.*, 24 A.3d at 66, 68, 70–71 (upholding a conviction for possession of a prohibited weapon where the blade of the defendant's folding pocketknife "measured two and fifteen-sixteenths inches long" and the defendant was "carrying an *open* folding knife," which the court remarked was "indicative of an intent to use it as a dangerous weapon"); *Mihas*, 618 A.2d at 199, 201 n.1 (upholding convictions for intent-to-frighten assault and possession of a prohibited weapon in a case in which, during a confrontation, the defendant possessed a paring knife with a two-and-three-quarters-inch-long blade).

Because we conclude that Mr. Jenkins's arrest was supported by probable cause, we need not determine whether Officer Davis is protected by qualified immunity from Mr. Jenkins's constitutional claim. *See Foster v. Metro. Airports Comm'n*, 914 F.2d 1076, 1079 (8th Cir. 1990) ("If probable cause was indeed present, it is not necessary to consider an immunity defense."); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("[J]udges . . . should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified

immunity analysis should be addressed first in light of the circumstances in the particular case at hand."). In addition, our resolution of the probable-cause issue also resolves Mr. Jenkins's common-law false arrest claim and assault and battery claims. *See Scales v. District of Columbia*, 973 A.2d 722, 729 (D.C. 2009) (stating that "if a police officer has so-called constitutional probable cause to arrest, determined by reference to the objective standard used to determine probable cause in a criminal proceeding . . . the arrest will be lawful and the officer accordingly will have a complete defense to a false arrest claim . . . . ") (internal quotation marks omitted).

We turn finally to Mr. Jenkins's negligent supervision claim. A party alleging negligent supervision must "show that an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 760 (D.C. 2001). As already noted, the Superior Court entered summary judgment in favor of the District on this claim without explaining its reasoning. The court may have assumed that a cause of action for negligent supervision could not lie because Officer Davis had probable cause to arrest Mr. Jenkins, and thus, his conduct was not tortious. *See Griffin v. Acacia Life Ins. Co.*, 925 A.2d 564,

576 n.32 (D.C. 2007) (per curiam) (citing *Daka, Inc. v. McCrae*, 839 A.2d 682, 693 (D.C. 2003), for the proposition that "[w]e have suggested — but not decided — that in an action seeking damages for negligent supervision, the conduct of the servant must be independently tortious."). Mr. Jenkins suggests, however, that the instant case is akin to *District of Columbia v. Tulin*, 994 A.2d 788 (D.C. 2010), in which this court reasoned that the finding that an officer was not liable for false arrest does not necessarily absolve the District from a claim of negligent supervision. *Id.* at 799 ("[T]he jury's verdict in favor of Officer McKoy with respect to the [false arrest claim] against her was not irreconcilable with its finding of liability against the District for negligent supervision."). In *Tulin*, the jury heard evidence that a very junior police officer arrested the plaintiff following a rear-end collision after being advised by two sergeants and a detective that the plaintiff's conduct was "an automatic lockup" despite the absence of any investigation into several "critical" questions bearing on the plaintiff's culpability. *Id.* at 797, 800. Harmonizing the jury's verdicts, we affirmed, reasoning that the jury could reasonably find that the officer "believed in good faith that she had the legal right and obligation to make the arrest," while further concluding that regardless of the officer's *bona fide* belief, the superior officers at the scene "should have recognized that the investigation was inadequate and that the arrest

was unlawful, but . . . nevertheless failed to prevent [the officer] from making it." *Id.* at 800.

*Tulin* is distinguishable from the instant case in several respects. First, Officer Davis did not make an unlawful arrest that was nonetheless privileged because of his good faith; rather, as we have concluded, he made a legal, valid arrest supported by probable cause. Second, there is no allegation or evidence in this case that the officers conducted an incomplete investigation. Third, there is no record evidence tending to show that Officer Davis was effectively a "puppet," *id.*, being manipulated by superiors on the scene who knew or should have known better. Thus, while *Tulin* shows that the District of Columbia may be liable for negligent supervision for allowing a police officer to make a false arrest based on a good-faith but mistaken belief that the arrest was proper, the allegations and undisputed facts of this case supported the entry of summary judgment in favor of the District. Accordingly, we affirm the judgment of the Superior Court that the District and Officer Davis were entitled to summary judgment on Mr. Jenkins's claims against them.

## B. Mrs. Jenkins's claims

Mrs. Jenkins brought a § 1983 claim against Officer Davis based on the search or frisk of her person as well as a common-law assault and battery claim against Officer Davis and the District of Columbia based on the same facts.[15] Although there is no dispute that Officer Davis was not the officer who performed the pat-down of Mrs. Jenkins, Mrs. Jenkins contends that Officer Davis may still be held vicariously liable for the asserted violation of her civil rights under a "bystander liability" theory. Under the bystander liability theory, which has been adopted by several federal circuit courts of appeal, a police officer may be held liable under § 1983 for another officer's constitutional violation if he or she "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Randall*

---

[15] The Jenkinses' complaint refers to the search of Mrs. Jenkins as a "full-body search," but Mrs. Jenkins confirmed in her deposition that the search was "outside of [her] clothing." Thus, it seems appropriate to refer to the search (for a knife) as a "frisk" or "patdown." *See* Black's Law Dictionary ("A frisk is a patdown search to discover a concealed weapon."); *see also Terry v. Ohio*, 392 U.S. 1, 17 n.13 (1968) (citing an article explaining that in a patdown, "[t]he officer must feel with sensitive fingers every portion of the prisoner's body. A thorough search must be made of the prisoner's arms and armpits, waistline and back, the groin and area about the testicles, and entire surface of the legs down to the feet."); *cf. People v. King*, 183 Cal. App. 4th 1281, 1286–287 (Cal. Ct. App. 2010) ("King proceeded to conduct a full body search of the woman, including reaching inside her bra to 'massage' her breasts, and digitally penetrating her vagina with each of his hands."); *Fletcher v. State*, 39 S.W.3d 274, 279 (Tex. App. 2001) ("Plaxco admitted that he did a pat-down search of Parker and not a full body search. Specifically, he admitted that he did not search Parker's shoes or socks.").

*v. Prince George's Cty., Md.*, 302 F.3d 188, 203–04 (4th Cir. 2002) (footnote omitted). We agree with Officer Davis that he was entitled to summary judgment in his favor on Mrs. Jenkins's § 1983 claim because Mrs. Jenkins has not borne her burden of coming forward with evidence that Officer Davis knew that the unnamed female officer was conducting the claimed unlawful pat-down on Mrs. Jenkins; had a reasonable opportunity to prevent the pat-down; and made a decision not to act.[16] Since the trial record is devoid of facts that would support holding Officer Davis liable as a bystander for the unnamed female officer's acts, we conclude that Officer Davis was entitled to judgment as a matter of law on Mrs. Jenkins's § 1983 claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (stating that "[t]he moving party is entitled to a judgment as a matter of law [where] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.") (internal quotation marks omitted).

---

[16] The Jenkinses' brief asserts that Officer Davis "directed the female law enforcement officers who searched Mrs. Jenkins to do so," but includes no record citation to support that assertion, and we see no such support in the record. Mrs. Jenkins stated in her deposition that the female officer "went to [converse with] the detectives" — not Officer Davis — when she first arrived on the scene. Moreover, the Reply Brief asserts that there was an arrest order by "Sergeant Arce" rather than a decision by Officer Davis to make the arrest, which suggests that it may have been Sergeant Arce who directed the female officer to do the patdown of Mrs. Jenkins.

Finally, we consider Mrs. Jenkins's common-law assault and battery claim against the District (which we, like the District, understand to be based on a *respondeat superior* theory). We begin our analysis by recognizing that "[a] police officer may have a qualified privilege in an assault and battery case." *Scales*, 973 A.2d at 730. Relatedly, the District may avoid vicarious liability for what would otherwise be common-law assault and battery by a police officer if it shows, with respect to conduct by one of its police officers alleged to constitute that tort, either that the conduct was constitutional or that the officer "(1) believed, in good faith, that his or her conduct was lawful, and (2) this belief was reasonable." *Bradshaw*, 43 A.3d at 323 (brackets omitted); *see also District of Columbia v. Minor*, 740 A.2d 523, 531 (D.C. 1999) (noting that "[t]his standard resembles the section 1983 . . . and qualified immunity standards . . . (with the added clear articulation of the requirement of good faith")). We have also said that "[f]or assault and battery the inquiry is whether the officer's conduct was reasonably necessary and thereby privileged." *Kotsch v. District of Columbia*, 924 A.2d 1040, 1048 (D.C. 2007); *Smith*, 882 A.2d at 788.

Mrs. Jenkins contends that the patdown search was not constitutional, and that the female officer could not have reasonably believed that it was lawful, because Mrs. Jenkins's right not to be searched was made clear by *United States v.*

*Di Re*, 332 U.S. 581 (1948) (holding that a passenger's mere presence in a car believed to contain contraband does not give rise to probable cause to search the suspect for contraband).[17]

As we explain below, we can decide this case on the basis of privilege and therefore need not definitively decide whether the patdown search of Mrs. Jenkins was lawful. In short, we conclude that the officers, including the female officer who searched Mrs. Jenkins, could reasonably have believed that the search was lawful. We also see no evidence in the record to suggest that the police acted in bad faith in searching, or directing the female officer to search, Mrs. Jenkins.

Our analysis rests largely on the fact that "some courts have adopted the so-called automatic companion rule, under which officers may conduct a patdown search of the companion of a lawfully detained suspect even though the officers lack a reasonable suspicion to believe that the companion is armed and dangerous."

---

[17] Mr. Di Re was a passenger in a vehicle whose driver was suspected of selling counterfeit gasoline ration coupons. After stopping the vehicle, officers arrested Mr. Di Re even though they had no previous information implicating him. At the police station, he was thoroughly searched, and counterfeit gasoline ration coupons were found on his person. The Supreme Court held that the search was unlawful. The Court was "not convinced that a person, by mere presence in a suspected car, loses immunities from search of his person to which he would otherwise be entitled." *Di Re*, 332 U.S. at 587.

*State v. Kelly*, 95 A.3d 1081, 1094 n.16 (Conn. 2014). The rule was first articulated in *United States v. Berryhill*, 445 F.2d 1189 (9th Cir. 1971),[18] in which the court concluded that "[a]ll companions of the arrestee within the immediate vicinity, capable of accomplishing a harmful assault on the officer, are constitutionally subjected to the cursory 'pat-down' reasonably necessary to give assurance that they are unarmed." *Id.* at 1193. As our court recognized in *Trice v. United States*, 849 A.2d 1002 (D.C. 2004), "the *Berryhill* rationale does not depend on the existence of a reasonable suspicion that is particular to the person frisked . . . ." *Id.* at 1007. We observed in *Trice*, *id.*, that this court "relied explicitly on *Berryhill*" in deciding *Mayes v. United States*, 653 A.2d 856 (D.C. 1995). We reasoned in *Mayes* that having "found a pistol on Mayes . . . the officers had the right to order the remaining occupants out of the car and, at least, to frisk them." 653 A.2d at 865; *see also Lewis v. United States*, 399 A.2d 559, 561 (D.C. 1979) (noting that "[t]he fact that his companion had just been arrested for unlawful possession of a firearm is a particularly compelling justification for the frisk of appellant[]" and quoting *Berryhill* for the point that "[i]t is inconceivable that a peace officer effecting a lawful arrest . . . must expose himself to a shot in the back

---

[18] *See* John J. O'Shea, Note, *The Automatic Companion Rule: A Bright Line Standard for the Terry Frisk of an Arrestee's Companion*, 62 Notre Dame L. Rev. 751, 751 n.10 (1987) (observing that "[n]o court that has adopted the automatic companion rule has indicated that the officer comply with any standard of suspicion with respect to the companion.").

from defendant's associate because he cannot, on the spot, make the nice distinction between whether the other is a companion in crime or a social acquaintance").[19]

Applied in this case, the automatic companion rule would dictate that having lawfully detained Mr. Jenkins upon the statements of a complainant and witness that Mr. Jenkins pulled out a knife while angrily confronting the complainant about a parking space, the police could also lawfully frisk Mr. Jenkins's companion, Mrs. Jenkins, to be sure that she was not armed. We need not endorse an "automatic companion" rule any further than our case law already has, to conclude that on the undisputed facts of this case there was no clear rule prohibiting police from frisking Mrs. Jenkins, and that the officers could reasonably have believed that the frisk of Mrs. Jenkins was lawful.

---

[19] "A number of courts have approved the *Berryhill* approach." *Commonwealth v. Ng*, 649 N.E.2d 157, 157 n. 1 (Mass. 1995) (collecting cases). *But see, e.g.*, *United States v. McKie*, 951 F.2d 399, 402 (D.C. Cir. 1991) (per curiam) (taking no position on the "automatic companion" rule); *United States v. Meadows*, 885 F. Supp. 1, 2 (D.D.C. 1995) ("It is undoubtedly a close question whether the 'automatic companion' frisk rule comports with the strictures of Fourth Amendment jurisprudence . . . .").

Neither *Di Re* nor *Ybarra v. Illinois*, 444 U.S. 85 (1979),[20] another case on which appellants rely, rendered such a belief objectively unreasonable. Unlike *Di Re*, the instant case is not a "mere presence in a suspected car" case. 332 U.S. at 587.[21] Mrs. Jenkins was not a mere passenger in the vehicle driven by a suspect (Mr. Jenkins). And unlike Mr. Ybarra, Mrs. Jenkins was not merely someone who happened to be present, along with several other people, in a public place where the police had reason to believe a certain individual possessed contraband. *See* 444 U.S. at 91. Rather, Mrs. Jenkins was Mr. Jenkins's wife (and, it may reasonably be inferred, wished to protect him); she was with him during the altercation in the parking lot (and, according to S.M., participated in the encounter by warning of follow-up action by her relative who was a "cop"); she left the parking lot with Mr.

---

[20] The Supreme Court held in *Ybarra* that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." 444 U.S. at 91.

[21] In *Di Re*, there were three passengers in the vehicle targeted by the police, including an informant, the driver whom police suspected of trafficking in counterfeit gas ration coupons, and Mr. Di Re. 332 U.S. at 583. The informant told the police officer that the driver was the source of counterfeit coupons found in his possession, "[b]ut the officer had no such information as to Di Re." *Id.* at 592. There also was no allegation that any of the three men had a weapon, but officers took all three into custody and, at the police station, "thoroughly searched" Mr. Di Re and found counterfeit coupons. *Id.* at 583. An observation by the *Berryhill* court applies equally here: "The distinction made in *Terry* between a limited search for weapons and a thorough personal search of a companion of the criminal, cogently distinguishes *Di Re* from the instant case." *Berryhill*, 445 F.2d at 1193.

Jenkins and returned to it with him; she was in the vehicle with Mr. Jenkins after an officer first asked Mr. Jenkins whether he had pulled a knife on the complainant and then told him to stay put in his vehicle while the officer spoke again with the complainant; and she was left alone in the vehicle when the police asked Mr. Jenkins to step out of the vehicle. These facts, all known to the police by the time the female officer searched Mrs. Jenkins, gave Mrs. Jenkins both an interest in concealing and an opportunity to conceal any knife that Mr. Jenkins had carried on his person or that was in the car. Mrs. Jenkins was much like the appellant in *Trice*, whom, we said, a detective could lawfully stop "even if the detective lacked sufficient reason to suspect Trice of criminal activity[,]" given that:

> A violent crime involving the use of a knife reportedly had just been committed nearby, and Castle matched the description of the criminal. . . . As he was walking with Castle, Trice appeared to be the companion of a potentially violent, fleeing criminal and not a mere bystander. Moreover, given the recency of the crime, it was reasonable to think that if Castle committed it, his companion Trice likely was aware of that fact and was a witness if not also an accomplice or an accessory after the fact. . . . [who] might have tried to help Castle resist arrest or retaliate against the officer.

*Trice*, 849 A.2d at 1008 (holding that "[u]nder these circumstances, our cases make clear that it was prudent, and hence constitutionally permissible, for Detective

Espinosa to freeze the situation briefly by forcibly detaining Trice along with Castle until help arrived.") (internal quotation marks omitted).[22]

Further, the following circumstances particular to this case enhanced the reasonableness of the police conduct. Mrs. Jenkins was wearing clothing of a type (*e.g.*, a collared shirt) and was wearing her hair in a style that (it appears from the record) might have permitted the concealment of a small pocket knife. Mr. Jenkins would have had an opportunity to transfer the knife to his wife before his arrest, and Mrs. Jenkins might have picked up the knife in the car and secured it on her person while the couple remained in their vehicle after first speaking with the officer, or while she remained in the car as the police questioned her husband.[23] The officers could reasonably believe that the frisk of Mrs. Jenkins "was reasonably necessary and thereby privileged." *Kotsch*, 924 A.2d at 1048.

The foregoing does not end our analysis, because "the test for qualified privilege in an assault and battery suit is both subjective and objective: the officer

---

[22] "As it happened, Castle was released; evidently he was not the man being sought for the stabbing at Hadley Hospital." *Id.* at 1005 n.2.

[23] And if the officers' search of the immediate area, including in trashcans and under cars, preceded their frisk of Mrs. Jenkins, that fruitless search increased the likelihood that the knife (if there was one) was on Mrs. Jenkins's person.

must subjectively believe" that his or her conduct was lawful. *Scales*, 973 A.2d at 730. This court has "not resolved the question of burden of proof as to . . . privilege in an assault and battery claim . . . ." *Smith*, 882 A.2d at 791; *see also Evans-Reid v. District of Columbia*, 930 A.2d 930, 938 (D.C. 2007) ("assum[ing], without deciding, that where a plaintiff establishes *a prima facie* case of assault and battery and the officer invokes the qualified privilege as an affirmative defense, the officer bears the burdens of production and persuasion"). We have reasoned, however, that if a plaintiff admittedly did not hear the conversation that precipitated an officer's challenged conduct, and thus does not know what motivated it, the plaintiff cannot avoid summary judgment by asserting that the officer's objectively reasonable conduct was undertaken in bad faith. *See District of Columbia v. Murphy*, 631 A.2d 34, 38 (D.C. 1993) ("If Mary Young or the officers had testified that she told them she had asked Murphy to leave and he had refused, this would be a different case. Such testimony would have been uncontroverted — because Murphy testified that he had not heard the conversation between Mary Young and the police officers — and thus would have supplied undisputed evidence requiring a conclusion, as a matter of law, that the officers had a reasonable, good faith belief in the lawfulness of the arrest."); *see also Bradshaw*, 43 A.3d at 327 ("If [Officer Jones's] testimony regarding what the bouncer told him about Bradshaw's fighting had been definitive and consistent, the

testimony — which described a conversation about which Bradshaw claims no personal knowledge — could have supplied a basis for summary judgment [on the issue of the officer's good faith in arresting Bradshaw]. . . .  In that circumstance, Bradshaw could have defeated summary judgment only if she had affirmative evidence to the contrary . . . .").

Here, Mrs. Jenkins acknowledged in her deposition that she did not hear what was said when the female officer arrived on the scene and spoke to the detectives before telling Mrs. Jenkins that she was going to search her.  Thus, Mrs. Jenkins does not know the content of any instructions or rationale the officers expressed.  "In that circumstance, [Mrs. Jenkins was entitled to] defeat[] summary judgment only if she had affirmative evidence" of the officers' bad faith. *Bradshaw*, 43 A.3d at 327.  The Jenkinses did not come forward with any such evidence; the summary judgment record is devoid of evidence that the police personnel who frisked Mrs. Jenkins or directed that she be frisked acted in bad faith. *Cf. Evans-Reid*, 930 A.2d at 941 (sustaining entry of judgment as a matter of law for the District on assault and battery claim based on police shooting because "the evidence that was admitted – even when viewed favorably to appellant – did not suffice for a jury to find for her [on the issue of bad faith] without engaging in speculation.") (footnote omitted).  Indeed, the Jenkinses do not even assert that the

officers acted in bad faith.  For these and all the foregoing reasons, we conclude that whether or not the frisk of Mrs. Jenkins was legal, the conduct of the officer who frisked Mrs. Jenkins was protected by privilege and the District was entitled to summary judgment on Mrs. Jenkins's assault and battery claim.

***

The Superior Court did not err in granting summary judgment in favor of the District and Officer Davis on the Jenkinses' claims.  Wherefore, the judgment of the Superior Court is

*Affirmed.*